Freeport Area School District, Appellant, v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Appellee.

Argued December 3, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Harry K. McNamee,* with him *James P. MacFarlane* and *Marshall, Marshall, McNamee & MacFarlane,* for appellant.

*Jay Harris Feldstein,* Assistant General Counsel, with him *Feldstein, Bloom & Grinberg,* for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, April 8, 1975:

The Freeport Area School District, located in Allegheny County, has appealed from an order of the Pennsylvania Human Relations Commission upholding a challenge to the district's maternity leave policy. The Commission, after hearing, concluded that the policy in question offended section 5(a) of the Pennsylvania Human Relations Act[1] which declares it unlawful for an employer to discriminate by reason of sex "with respect to compensation, hire, tenure, terms, conditions or privileges of employment . . .," ordered the district to make payments to four employes with respect to whose employment the policy had been applied, directed the district to alter its policy to conform to Commission regulations[2] and to report to the Commission its actions with reference to the change of policy.

---

1. Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a) (Supp. 1974-1975).

2. The Commission's Guidelines on Sex Discrimination in effect at the time the Freeport Area School District's policy was formulated merely provided that a reasonable maternity leave must be granted. New proposed regulations on the subject appearing in the Pennsylvania Bulletin, Vol. 4, No. 54, p. 2642, published December 21, 1974, prescribes policies which require pregnant employes to take leave at specified times during or after termination of pregnancy.

The district's maternity leave policy is embodied in a collective bargaining agreement effective August 30, 1971, negotiated by the district and the Freeport Education Association, the bargaining representative of professional employes, including the persons afforded relief by the Commission's order herein. Article XV of the agreement, entitled "Unpaid Leaves of Absence" provides as follows:

"Maternity

Maternity leave shall be granted to an employee under the following conditions:

1. As soon as an employee becomes aware of her pregnancy, she shall, on the prescribed Board form, notify the Superintendent.

2. She may request maternity leave in writing up to 3½ months prior to the estimated date of birth. In no event shall her employment continue during the 3½ months immediately preceding the estimated date of birth.

3. Written application to the Superintendent for re-employment may be made any time within 3 months after the date of birth or other termination of pregnancy and said employee must be available for re-employment within 12 months after the date of notification of intent to resume employment.

4. Upon receipt of written application for re-employment, the Board shall offer her the same professional assignment she held before going on maternity leave or a substantially equivalent professional assignment, if said assignments are available. If said assignments are not available, the Board shall offer her any other available professional assignment for which she is certified until such time as the Board can, through established placement procedures, offer her the professional assignment she held before, or one substantially similar to it."

On September 27, 1972, Linda Szul, a teacher in the district since 1969 and the complainant herein, being pregnant, applied for maternity leave, giving April 7, 1973, as the likely date of birth. Consonant with Article XV of the collective bargaining agreement, the district notified Mrs. Szul that her leave was to commence December 23, 1972, 3½ months before the predicted date of birth. Preferring to work for as long as she was able, Mrs. Szul informed the Board that she desired to remain on the job through February 9, 1973, the date until which her doctor had advised that she could physically discharge her duties. The district refused this deviation from its policy.

On December 19, 1972, Mrs. Szul filed a complaint with the Human Relations Commission alleging discrimination on the basis of sex by reason of the arbitrary termination of her employment for pregnancy. On January 11, 1973, Mrs. Szul filed an amended complaint with the Commission additionally alleging that the district's policy "has a discriminatory affect [sic] on the complainant and other females similarly situated because of their sex, female."

The district's answer to the amended complaint averred that the "rules and regulations in regard to maternity leave are reasonable and non-discriminatory on the Complainant or any other females similarly situated."

Prior to hearing and in response to a request by a Commission investigator, the district superintendent provided information as to termination dates, salaries, and other information concerning teachers other than Mrs. Szul who had been granted maternity leaves since 1969. At the hearing, in addition to the evidence given by Mrs. Szul, the Commission adduced the testimony of Karen Harrison, Mary Ippolito, and Darlaine Thompson, other district teachers who had taken maternity leaves. These persons did not file individual complaints with the Com-

mission, did not formally join in the complaint filed by Mrs. Szul, and did not intervene as complainants.[3] Their testimony was presented pursuant to the "other females similarly situated" language of Mrs. Szul's amended complaint.

The Commission concluded as a matter of law that the district's maternity leave policy was discriminatory in requiring termination of employment $3\frac{1}{2}$ months before predicted birth, and in assertedly not making full time reemployment available when affected employes are physically able to resume their duties. As noted, the Commission ordered the district to correct its maternity leave policy and to pay Mrs. Szul and the three additional teachers who testified at the hearing substantial sums for lost wages, accumulated sick leave, and for the loss of insurance and pay increment benefits.

Our review of an order of the Human Relations Commission is limited to determining whether it is in accordance with law, whether necessary findings of fact are supported by substantial evidence and whether the Commission abused its discretion. *Tomlinson Agency v. Pennsylvania Human Relations Commission*, 11 Pa. Commonwealth Ct. 227, 312 A.2d 118 (1973). The appellant district attacks the Commission's order as contrary to law and as beyond the authority of the Commission.

The respondent school district argues that the portion of the order finding the maternity leave policy discriminatory is contrary to law because the policy was negotiated as part of the collective bargaining agreement between the district and the teachers' representative and was framed in accordance with what was then determined, in good faith, by the negotiators to be applicable law as to maternity policies. However, the law is that a

---

3. A Commission rule at 16 Pa. Code §41.52 makes the General Rule of Administrative Procedure at 1 Pa. Code §§35.27-35.32, providing for intervention, not applicable to Human Relations Commission proceedings.

collective bargaining provision fixing the obligation of employers inconsistent with the statutory rights of employes will not preclude the latter from pursuing those rights. *Stollar v. Continental Can Company*, 407 Pa. 264, 180 A.2d 71 (1962) ; *Gianfelice Unemployment Compensation Case*, 396 Pa. 545, 153 A.2d 906 (1959). Moreover, the Freeport agreement itself contains the following:

> "Nothing contained herein shall be construed to deny or restrict to any professional employee such rights as he may have under the Public School Code of 1949, as amended, or other applicable laws and regulations."

The applicable law was understandably misapprehended by the parties to the labor agreement. The amendment to section 5(a), adding discrimination on the basis of sex as an unlawful activity[4] upon which this action is predicated, was effective well in advance of the formulation of the district's policy by the collective bargaining agreement. While it is true that section 5(a) as thus amended had not been the subject of judicial interpretation with respect to the subject of maternity leave when Freeport's policy was promulgated, it has since been held to mean that pregnant women may not be treated differently from any other employe suffering under a physical disability.

The instant case, insofar as it involves prenatal terminations of active employment, is controlled in principle by *Cerra v. East Stroudsburg Area School District*, 450 Pa. 207, 299 A.2d 277 (1973), where our Supreme Court held that the dismissal of a school teacher for failure to resign at the end of the fifth month of her pregnancy violated section 5(a), writing:

> ". . . Mrs. Cerra's contract was terminated absolutely, solely because of pregnancy. . . . There was

---

4. Act of July 9, 1969, P.L. 133, §2, 43 P.S. §955(a), effective immediately.

no evidence that the quality of her services as a teacher was or would be affected as a result of the pregnancy. Male teachers, who might well be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated. In short, Mrs. Cerra and other pregnant women are singled out and placed in a class to their disadvantage. They are discharged from their employment on the basis of a physical condition peculiar to their sex. This is sex discrimination pure and simple." 450 Pa. at 213, 299 A.2d at 280.

Here, Mrs. Szul, Mrs. Harrison and Mrs. Ippolito,[5] in accordance with the district's policy, were forced on leave 3½ months before the birth of their children and while they were able to continue their work. They and other pregnant employes were singled out to their disadvantage and their employment suspended on the basis of their sex and without regard for their fitness for continued service and employment.

It is worth noting that the United States Supreme Court in *Cleveland Board of Education v. La Fleur,* 414 U.S. 632 (1974), held that the policies of two school boards mandating respectively four and five months' prenatal leaves violated the due process rights of female teachers. Similar policies as to pregnant employes were struck down in *Green v. Waterford Board of Education,* 473 F.2d 629 (2d Cir. 1973), and *Wetzel v. Liberty Mutual Insurance Company,* 372 F. Supp. 1146 (W.D. Pa. 1974).

---

5. The incidence of Mrs. Thompson's pregnancy antedated the district's policy but her child was born about two weeks after it went into effect. The Commission did not direct that she be paid prenatal lost pay, apparently either because she was not subjected to an arbitrary prenatal leave requirement or because there was not proof of a discriminatory policy before the collective bargaining agreement became effective. Nor did the Commission order that postnatal lost pay be paid to Mrs. Szul, Mrs. Harrison and Mrs. Ippolito, all of whom seem at the time of the hearing not yet to have given birth to their children.

Passing now to the Freeport Area School Board's reemployment policy, we find it to be reasonable and non-discriminatory on its face. Article XV (4) mandates reemployment upon application made within three months after birth or other termination of pregnancy in the position formerly held, if available, or in another professional position for which the employe is certified. Further, the collective bargaining agreement provides at another place:

"Any teacher who is unable to teach because of personal illness or disability and who has exhausted all sick leave and sabbatical leave, if available, shall be granted a leave of absence without pay for the duration of illness or disability, up to one calendar year from the established date of the exhaustion of the above-described leave. Re-employment procedure shall be in accordance with maternity leave provisions, unless the return to employment is at the end of a sabbatical leave occurring as prescribed in the Public School Code of 1949, as amended."

In short, Freeport's policy of reemployment upon application within three months after disability, applicable to all kinds of disability and available to all employes regardless of sex is not discriminatory. We note that a contrasting reemployment procedure also struck down in *Cleveland Board of Education v. La Fleur, supra,* provided that new mothers should be ineligible for reemployment until three months after delivery. In *Cohen v. Chesterfield County School Board,* 414 U.S. 632 (1974), a policy fixing eligibility for reemployment upon a physician's certification of fitness any time after delivery and reemployment guaranteed no later than the first day of the school year next following the date of such certification was upheld.

The Commission further discerned discrimination against Mrs. Thompson in fact from evidence that a male teacher disabled in 1969 returned to work promptly when able and that Mrs. Thompson, who delivered a child in

late 1971 and who thereafter twice asked for reemployment, had not been reemployed at the time of the Comsion's hearing in April, 1973. However, as the dates given demonstrate, the male employe's disability and reemployment occurred before the Board's policy here complained of was inaugurated and Mrs. Thompson's disability occurred afterward. Moreover, one incident of treatment accorded a male different from that accorded a female does not, without more, provide substantial evidence that the latter had been a victim of discrimination.

As previously mentioned, the Commission directed the payment of lost pay not only to Mrs. Szul, who filed a complaint, but also to Mrs. Harrison, Mrs. Ippolito and Mrs. Thompson who had not. The Commission justified its inclusion of these additional employes in the proceedings as the recipients of relief, on the ground that the amendment of Mrs. Szul's complaint asserting that it is brought in behalf of "other females similarly situated" gave the proceedings "the effect of a class action but not the technical requirements of state and federal rules of civil procedures." Appellant asserts that the Commission's action was beyond its authority.

The Commission does not contend that its order with respect to Mrs. Harrison, Mrs. Ippolito and Mrs. Thompson is authorized as a class action; nor could it. The class action is a procedural device which did not exist at common law and for which statutory or rule authority must be found. The Pennsylvania Rules of Civil Procedure, including, of course, Pa. R.C.P. No. 2230 authorizing class actions, do not apply to proceedings before administrative agencies and commissions. If they did, moreover, the instant action would be subject to the immediate objection of lack of numerosity.[6] Neither the

---

6. It has been suggested that forty or fifty is normally the number of class members required to satisfy the numerosity requirement of Pa. R.C.P. No. 2230. *See Delle Donne* and *VanHorn*, "Pennsylvania Class Actions: The Future in Light of Recent Restrictions on Federal Access?" 78 Dick. L. Rev. 460, 501 (1974).

Rules of the Pennsylvania Human Relations Commission itself, found at 16 Pa. Code §41.1 et seq. or the General Rules of Administrative Practice, found at 1 Pa. Code §31.1 et seq., provide for class actions in administrative proceedings.

The Commission contends, however, that where practice of discrimination against a protected class or activity is alleged and proved, it has the power to take affirmative action to redress individuals injured by the practice. We disagree. These teachers did not make complaint to the Commission, did not sign a complaint, did not request to be a party to the proceeding, did not become a party to the proceeding, and did not assert any right to, or make any demand or claim for, money. Their only connection with this case was as subpoenaed witnesses and recipients of the Commission's unauthorized largesse and all-protective care. If due process is lacking in any aspect of this case, such awards surely focus center-stage attention on the denial of due process to the school district.

Finally, the Commission ordered the respondent district to pay Mrs. Szul $1,014.42 "representing the amount . . . she would have received had she been permitted to use her accumulated days of sick leave." We have insurmountable difficulty with this part of the Commission's order. In the first place, the record affirmatively shows that none of the teachers to whom the Commission directed payment for accumulated sick leave requested sick pay and that they remain entitled to their accumulated sick leave. Section 9 of the Human Relations Act authorizes the Commission, by affirmative action orders, to place employes in the position they would have been but for the discrimination visited upon them, a purpose fully accomplished in this case, by directing the payment of salary. More than this is accomplished by directing the payment of salary and sick pay for a part of the same period of forced inactivity. As noted, if Mrs. Szul

does not receive sick pay, she remains possessed of her accumulated sick leave mandated by section 1154 of the Public School Code of 1949, Act of March 10, 1949, *as amended*, P.L. 30, 24 P.S. §11-1154. Indeed, the Commission's order is lacking logic. It finds discrimination in the fact that the complainant was unlawfully required to take leave while still able to teach but that she was entitled to sick leave as a professional employe prevented by illness from following her occupation.

Accordingly, we make the following:

ORDER

Now, April 8, 1975, we direct that the Commission's order be set aside insofar as it awards any affirmative relief to Karen Harrison, Mary Ippolito, and Darlaine Thompson. We further direct that said order be set aside insofar as it awards Linda Szul $1,014.42 in sick pay. The Commission's said order, as so modified, is affirmed.

———

CONCURRING AND DISSENTING OPINION BY JUDGE ROGERS:

I concur in the majority's holdings that the school district's prematernity leave policy is discriminatory, that its post maternity reentry policy is not discriminatory, that the Commission improperly directed payment to Mrs. Szul of pay for sick leave as well as back salary and, of course, its affirmance of the Commission's order for the payment of back salary to Mrs. Szul for the time she spent on prematernity leave pursuant to the Board's discriminatory policy on this subject. I respectfully dissent from the majority's holding that the Board was without power to grant the affirmative relief of ordering the district to pay Mrs. Harrison and Mrs. Ippolito back pay because they had not filed complaints.[1]

———

1. The Commission ordered the district to pay Mrs. Thompson back pay only for the post maternity period. Since I believe

The record shows that a Commission investigator ascertained before the Commission hearing that Mrs. Ippolito and Mrs. Harrison, as well as Mrs. Szul, had been placed on maternity leave in pursuance of the school board's policy. The investigator asked them if they had objections to being included in the case as objects of relief and their reply was, of course, that they did not. They testified at the hearing. In addition, as we point out later, the school district was fully aware that the cases of Mrs. Ippolito and Mrs. Harrison were involved in the proceedings.

The Commission contends that, where a practice of discrimination against a protected class or activity is alleged and proved, it has the power to take affirmative action to grant the redress of back pay to employes injured by the practice regardless of whether they have filed complaints. It advances in support of its contention the known evils of discrimination and the general direction given the Commission by the Pennsylvania Human Relations Act to investigate and eliminate discrimination. I agree with the Commission's conclusion. I do not agree that its order must depend on the amorphous support it advances. I find authority for the Commission's action in Section 9 of the Human Relations Act, *as amended*, 43 P.S. §959 (Supp. 1974-1975), pertinent provisions of which are as follows:

"Any individual claiming to be aggrieved by an *alleged unlawful discriminatory practice* may make, sign and file with the Commission a verified complaint in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and

the district's policy in this regard was not discriminatory, this portion of the Commission's order was, in my view, properly set aside by the majority and, for this reason alone, she is not mentioned in this dissenting opinion.

which shall set forth the particulars thereof and contain such other information as may be required by the Commission. The Commission upon its own initiative or the Attorney General may, in like manner, make, sign and file such complaint. . . ."

"After the filing of *any complaint,* or whenever there is reason to believe that an *unlawful discriminatory practice* has been committed, the Commission shall make a prompt investigation in connection therewith."

. . .

"If, upon all the evidence at the hearing, the Commission shall find that a respondent has engaged in or is engaging in any *unlawful discriminatory practice* as defined in this act, the Commission shall state its findings of fact, and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such *affirmative action including* but not limited to hiring, reinstatement or upgrading of *employes, with or without back pay.* . . ."

". . . Any complaint filed pursuant to this section must be so filed within ninety days after the alleged *act* of discrimination. . . ." (Emphasis supplied.)

The provisions, paraphrased, require that proceedings leading to orders of the Commission be commenced by complaint which may be filed by an individual, or the Attorney General or by the Commission itself. If, after an investigation and hearing, a practice of unlawful discrimination is found to have been engaged in, the Commission is empowered to require the employer to take affirmative action, including reinstatement of employes with back pay. While the Section requires that a complaint be filed, it does not restrict the Commission in ordering reinstatement with pay only to persons who have filed complaints. To construe the Act to provide that only formal complainants may be given such relief would,

in the case of actions commenced by the Commonwealth or the Attorney General, deny the Commission's power to afford affirmative action in the form of redress for affected employes—a result which the Legislature neither expressed nor, in my judgment, intended. That a complaint happens to have been brought by an individual, as in this case, should make no difference. The Section provides that if upon the hearing of any complaint, the Commission finds a practice of discrimination, it may order the employer to take affirmative action with respect to employes who have been victims of the unlawful practice.

What then of the requirement that the complaint must be filed within ninety days after the alleged act of discrimination? It means, we believe, that an act of discrimination, not alleged to be the result of a practice, must be the subject of a complaint filed within that period and that an act of discrimination in pursuance of a practice must likewise have occurred not more than ninety days before the filing of complaint. It speaks to the time for commencing an action, not to the content of the Commission's order; it is a form of absolution for employers who have amended their practices to conform to law, not a limitation on the power of the Commission to redress wrongs to employes committed by an employer engaging in a discriminatory practice as late as ninety days before the filing of complaint. Section 9, in my opinion, does not mean that the Commission is without power to order affirmative action with respect to employes who have been subjected to discrimination by application of an unlawful practice, merely because they have not filed complaints. Nor, although not pertinent to the cases of Mrs. Harrison and Mrs. Ippolito who were placed on leave after the filing of the Szul complaint,[2] does it mean that the Commission may not grant

2. Mrs. Szul's complaint was filed December 23, 1972; Mrs. Harrison was placed on maternity leave on February 14, 1973,

relief by ordering affirmative action with respect to employes who have been victimized by a discriminatory practice at a time longer than ninety days previous to the filing of a complaint alleging an act of discrimination to another within the period.

I would hold therefore that the Commission may grant affirmative relief to employes identified as affected by a proved unlawful discriminatory practice who have not filed complaints, in a proceeding filed by another employe within ninety days from the act of discrimination committed upon the complainant in pursuance of the practice, whether the acts of discrimination toward non-complainants occurred more than ninety days before the filing of the complaint or, as in this case, after the filing of the complaint and pending the cause.

The school district objects that it had no notice of the inclusion in the case of employes other than Mrs. Szul until their testimony at the hearing and that it was thus prejudiced in the presentation of its defense. Clearly, due process requires that employers have reasonable notice of the nature and extent of the charges against them,[3] including, in this kind of case, the identities of persons, not complainants, who may be included as objects of relief in the Commission's order. However, I learn from the record that the school district here received ample notice that others than Mrs. Szul were involved by (a) her complaint so alleging, which averment it denied, and (b) the fact that the respondent was requested to and did supply to Commission investigators prior to hearing the names and other facts concerning the cases of Mrs. Harrison and Mrs. Ippolito.

I would set aside the Commission's order directing the payment of sick pay to Linda Szul and Karen Harrison,

---

her baby was due May 29, 1973; Mrs. Ippolito was placed on leave February 23, 1973, her baby was due June 9, 1973.

3. *Straw v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 99, 308 A.2d 619 (1973).

and of back pay and other sums to be ascertained to Darlaine Thompson; and I would affirm the Commission's order as so modified.

---

CONCURRING AND DISSENTING OPINION BY JUDGE WILKINSON:

I concur in most of what Judge ROGERS stated in his concurring and dissenting opinion. However, I cannot agree that awards may be made to employees whose identity, the fact that they are making a claim, and the amount of the claim were not made known to the employer within the 90-day period that a complaint might have been filed by them. In my opinion, the 90 days begins to run, *qua* a particular complainant, from the time that complainant is adversely financially affected by the act complained of and, therefore, has a claim for damages. In this case, both Mrs. Ippolito and Mrs. Harrison meet these tests. Therefore, I would join in the disposition of this case in the manner proposed by Judge ROGERS.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent for two reasons.

First: I believe the classification provisions in question here, contrary to the majority's analysis, are disability classifications and not sex classifications. Such classifications rationally serve a legitimate state interest; namely, the prerogative to operate a public school system.

Second: The United States Supreme Court, in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 647 n. 13, 94 S. Ct. 791, 799, 39 L. Ed. 2d 52, 64 (1974), indicated that *school boards may require* all pregnant teachers to cease teaching "at some firm date during the last few weeks of pregnancy." Here the maternity leave provisions establishing the firm date when pregnant teachers would cease teaching are a part of the *collective*

*bargaining agreement* between the school district and the teachers' representative. It is my view that these negotiated provisions are reasonable and permissible subjects of collective bargaining and do not violate or restrict the rights of pregnant teachers under the Constitution or under any applicable laws and regulations. It is noteworthy that none of the numerous cases cited by the majority deals with a classification for pregnant teachers which was the result of collective bargaining in which the teachers were coequal participants.