Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission *v.* Thorp, Reed & Armstrong, Appellant. Marcella Phelps Hanson, Intervening Appellee.

Argued October 29, 1975, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*Judd N. Poffinberger, Jr.,* with him *Kirkpatrick, Lockhart, Johnson & Hutchison,* for appellant.

*Katherine H. Fein,* Assistant General Counsel, with her *Sanford Kahn,* General Counsel, for appellee.

*Anthony P. Picadio,* for intervening appellee.

*Paulette J. Balogh,* Counsel, for amicus curiae, Southwestern Pennsylvania Council of the National Organization for Women.

*Leslie Cooney, Zelda Curtiss, Jane Davis, Sally Frick, Rita Levine,* and *Marcia Webb,* for amicus curiae, Duquesne Women Law Students Association.

*Jon G. Hogue, Louise R. Malakoff, Frances O. Tennant,* and *Samuel A. Vitaro,* for amicus curiae, The Legal Rights of Women Section of the Allegheny County Bar Association.

OPINION BY JUDGE BLATT, June 24, 1976:

This is a case of first impression involving a question of alleged discrimination in employment under Section 5(d) of the Pennsylvania Human Relations Act[1] (Act), which provides:

"It shall be an unlawful discriminatory practice unless based upon a bona fide occupational qualification . . . .

[1] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(d).

"(d) For any employer, employment agency or labor organization to discriminate *in any manner* against any individual because such individual has opposed any practice forbidden by this act, or *because such individual has made a charge,* testified or assisted, in any manner, *in any investigation, proceeding or hearing under this act."* (Emphasis added.)

We have previously, of course, considered many cases of alleged discrimination in employment under Section 5(a) of the Act,[2] and an issue of discrimination as prohibited under that section of the Act and as between the same parties here concerned may yet come before us if and when either party appeals from a still pending decision of the Pennsylvania Human Relations Commission (Commission) as to whether or not there was *also* discrimination in employment in this case because of the claimant's age or sex. Here, however, we are concerned only with the employer-appellant's appeal from the decision of the Commission that the employee-appellee, because of her original complaint of discrimination under Section 5(a) which has not yet been adjudicated, was later discriminated against under Section 5(d), and, if so, whether or not the Commission's order should be affirmed as issued.

The facts may be briefly stated. Marcella Phelps Hanson, then a 49-year-old woman attorney, who had then been employed as an associate of the law firm of Thorp, Reed & Armstrong (Thorp Reed) since No-

---

[2] Section 5(a) of the Act, 43 P.S. §955(a), provides in part as follows:

"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . .

"(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to

vember 1970, filed a complaint with the Commission on December 20, 1974 charging discrimination in employment because of age and sex. Thorp Reed was not informed of this complaint, either by the Commission or by Ms. Hanson, until Thursday, March 6, 1975 when Ms. Hanson advised Mr. Ralph DeStefano, a partner in the firm, that the Commission would be serving a complaint on the firm the following day. About one hour later, after Mr. DeStefano had reported the matter to Mr. Clyde W. Armstrong, a partner and secretary of the firm's Executive Committee, Mr. Armstrong directed Ms. Hanson by a written memorandum to prepare a list of the files which she was handling on matters concerning clients of the firm, so that such matters could be reassigned. On the following Monday, March 10, 1975, a letter was drafted and delivered in behalf of the firm to Ms. Hanson placing her on an indeterminate leave of absence with pay but otherwise completely disassociating her from the firm. She responded two days later, on March 12, 1975, by filing a second complaint with the Commission, charging therein that Thorp Reed's actions on March 10, 1975 amounted to another unlawful discriminatory practice under Section 5(d) of the Act. The Commission, which had as yet scheduled no hearing on the first complaint, scheduled and held hearings on the second complaint before three hearing commissioners on April 10 and 11, 1975, and issued its adjudication on June 1, 1975, determining that Thorp Reed had violated Section 5(d) of the Act. Its order directed that Ms. Hanson be restored to the full status which she enjoyed with the firm on March 6,

---

otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required."

1975.[3] Thorp Reed here appeals from that adjudication.

The Administrative Agency Law [4] limits our scope of review here to a determination as to whether or not the findings of fact necessary for the Commission's adjudication were supported by substantial evidence, whether or not the adjudication was made in accordance with law, and whether or not the Commission abused its discretion either in reaching its decision or in directing appropriate relief. *Freeport Area School District v. Pennsylvania Human Relations Commission*, 18 Pa. Commonwealth Ct. 400, 335 A.2d 873 (1975); *Midland Heights Homes v. Pennsylvania Human Relations Commission*, 17 Pa. Commonwealth Ct. 563, 333 A.2d 516 (1975). And, of course, our re-

---

[3] The order of the Commission directed Thorp Reed as follows:

"1. The Respondent shall rescind all action it took with regard to Complainant's status with the firm as [a] result of her filing the complaint with the Commission and shall forthwith restore her to the position she was in at the time she informed Respondent she had filed the complaint.

"2. Respondent shall take no action to disturb Complainant's restored position with the firm, and shall provide her with all of the facilities and advantages she had previously enjoyed, and shall continue to make assignments to her without regard to the pendency of her complaint and consistent with the quality she could reasonably have expected prior to the time Respondent learned she had filed a complaint.

"3. Respondent shall take affirmative steps to insure that Complainant is not harassed or subjected to any discomforture by any of the partners or employes of the firm.

"4. The fact that Complainant filed a charge with the Commission against Respondent shall not be considered by the Respondent in any employment action or decision it takes in regard to Complainant.

"5. The Respondent shall within two weeks of the effective date of this order inform the Commission of the manner of compliance with this Order."

[4] Act of June 4 1945, P.L. 1388, *as amended*, 71 P.S. §1710.1 et seq.

view must be limited to the adjudication here under appeal, which, as previously noted, concerns only Ms. Hanson's second complaint charging Thorp Reed with Section 5(d) discrimination. We are *not* here concerned with her first complaint which charged age and sex discrimination under Section 5(a) of the Act.

Thorp Reed first raises a procedural due process challenge to the hearings held by the Commission on April 10 and 11, 1975. It argues that, at those hearings, an assistant attorney general who was attached to the legal branch of the Commission presented the charges, while, at the same time, the General Counsel, who was also attached to the legal branch of the Commission, served as legal advisor to the hearing commissioners. Unquestionably this commingling of prosecutorial and adjudicatory functions in the legal office of the Commission "comes perilously close" to a violation of due process. *State Board of Medical Education and Licensure v. Grumbles,* 22 Pa. Commonwealth Ct. 74, 347 A.2d 782 (1975). We clearly do not have the constitutionally permissible circumstances where prosecutorial and adjudicatory functions are handled by separate branches of an administrative entity, *see State Dental Council and Examining Board v. Pollock,* 457 Pa. 264, 318 A.2d 910 (1974); nor do we have the constitutionally impermissible circumstances where prosecutorial and adjudicatory functions are commingled in the same individual, *Dussia v. Barger,* Pa. , 351 A.2d 667 (1975); *Horn v. Township of Hilltown,* Pa. , 337 A.2d 858 (1975); *Gardner v. Repasky,* 434 Pa. 126, 252 A.2d 704 (1969); *English v. North East Board of Education,* 22 Pa. Commonwealth Ct. 240, 348 A.2d 494 (1975); *In re: Appeal of Feldman,* 21 Pa. Commonwealth Ct. 451, 346 A.2d 895 (1975); and most notably *Pennsylvania Human Relations Commission v. Feeser,* 20 Pa. Commonwealth Ct. 406, 341 A.2d 584

(1975). Instead, we have two individuals who are both within the same branch of an administrative entity, one handling a prosecutorial function and the other separately handling an adjudicatory function. These circumstances place us at the interface between a constitutionally permissible and a constitutionally impermissible commingling of prosecutorial and adjudicatory functions. *See State Board of Medical Education and Licensure v. Grumbles, supra.*

We are mindful, of course, that a fair trial in a fair tribunal is the basic requirement of due process and that fairness requires the absence of actual bias in the trial of cases. *In re Murchison,* 349 U.S. 133 (1955); *accord, Dussia v. Barger, supra.* We also recognize that the most critical function in the prosecution and adjudication of administrative cases is in the resolution of disputed facts because the findings of fact which result from administrative proceedings are subject to only limited appellate review. The fact finding process, therefore, must be afforded the broadest dimensions of constitutional protection.

We have, however, meticulously examined the proceedings before the hearing commissioners in this case and we cannot find that the Commission and its counsel have crossed here into unconstitutional realms. In this respect, it is significant that the facts of this case are largely undisputed and that the findings of the Commission which were necessary to support a violation of Section 5(d) of the Act are not challenged by the appellant. The possible absence of constitutional protections during the critical fact finding phases of this case, therefore, was not a factor which resulted in any unfairness to Thorp Reed. The issue, consequently, is a matter of legal determination, not of determination of fact. And, while it may be extremely difficult to uncover bias or unfairness among an agency's findings of fact, a reviewing court unques-

tionably has power to examine the legal conclusions drawn therefrom (which we have done,) whether such conclusions were affected by bias or otherwise.[5] Viewing the case in this light, we do not believe that Thorp Reed has been denied due process of law.

Thorp Reed also argues that, even if the procedure can be held constitutional, Section 5(d) of the Act was not actually violated in this case. It contends first that what it did was actually not discriminatory under the Act. It must be noted, however, that an unlawful discriminatory practice may be established upon a well supported finding that an employer has taken "any manner" of discriminatory action against an individual because he or she has filed a charge under the Act, and that neither animosity nor resentment need be shown to establish a violation. Here the Commission has found that, when, on March 6, 1975, Thorp Reed learned that Ms. Hanson had filed a charge under the Act, a determination was then made by Thorp Reed that she should no longer continue to represent "firm clients"[6] and she

[5] For example, one of the instances alleged by Thorp Reed to be violative of due process occurred when the assistant attorney general prosecuting the case for the Commission objected to Thorp Reed's offer to present W. Edward Sell, Dean of Admissions for the University of Pittsburgh School of Law, as an expert on the subject of legal ethics and agency law. After consulting with the General Counsel to the Commission, the hearing commissioners refused to allow Mr. Sell's testimony. Such testimony, of course, would have been directed to the legal issue concerning the applicability of the Code of Professional Responsibility rather than to factual determinations, and that issue has had full consideration by this Court in this appeal.

[6] Firm clients are those clients handled by associates on assignment from the firm and should be distinguished from an associate's personal clients who are acquired by personal contact rather than by assignment from the firm. At Thorp Reed, an associate received a salary for handling "firm" clients and split his or her personal fee with the firm for handling matters involving personal clients.

was directed, therefore, to list the files which she had been handling for those clients so that the files could be reassigned. The Commission also found that Thorp Reed's executive committee met on Saturday, March 8, 1975, and further agreed that, as of March 10, 1975, Ms. Hanson would be (and she was): (1) placed on an indeterminate leave of absence with full salary and insurance coverage; (2) relieved of the split fee arrangement with respect to her personal clients so that she would handle those clients under her name alone as her exclusive accounts; (3) directed to relocate her personal files to some other facility; and (4) directed to refrain from using the firm stationery or from otherwise holding herself out as an associate or representative of the firm in any way whatsoever. As of that date, therefore, Ms. Hanson, was deprived of the prestige which comes through an association with a law firm of good standing and of whatever benefits she might have gained through continuing to handle the matters of any firm clients. More obviously, she lost the use of office space and the services of a secretary and a messenger as well as the use of the firm library and of various copying and other office machines. Thorp Reed's action, therefore, as the Commission found, was clearly discriminatory conduct, and as such, unlawful under Section 5(d) of the Act.

Thorp Reed next attempts to excuse the action it took, even if such could be categorized as discriminatory, on the ground that the Code of Professional Responsibility (Code) applicable to lawyers [7] required such action. This Code is designed as an inspirational guide to the legal profession and as a basis for disciplinary action by our Supreme Court where the conduct of a lawyer falls below the required minimum

[7] Pennsylvania Rules of Court, p. 175 (1975), adopted by our Supreme Court on February 27, 1974.

level.[8] It has nine Canons which provide the general ethical concepts from which nine sets of Ethical Considerations and Disciplinary Rules are derived, all of which have been adopted by our Supreme Court in accordance with the Constitution of Pennsylvania and the Pennsylvania Rules of Civil Procedure. Thorp Reed argues that these operate to suspend all laws inconsistent with their provisions, citing Article V, Section 10(c) of the Constitution of Pennsylvania and Pa. R. C. P. No. 205 and Thorp Reed claims that, to the extent its actions were made necessary by the Code, it must be exonerated from any liability under the Human Relations Act, vigorously asserting that the Code's Canons 4 and 5 made the action necessary which it took with respect to Ms. Hanson. These Canons provide as follows: Canon 4: "A lawyer should preserve the confidence and secrets of a client." Canon 5: "A lawyer should exercise independent professional judgment on behalf of a client." According to Thorp Reed, when Ms. Hanson filed her original complaint on December 20, 1974, and, from that time forward, she necessarily stood in an adversary relationship to the firm which might result either in the impairment of her professional judgment in the continued handling of matters involving firm clients or in her disclosure of client confidences at any hearings to be held by the Commission concerning the original age and sex discrimination charge. It is also possible, however, that, if Thorp Reed had permitted Ms. Hanson to retain the use of the firm's office space, service personnel, and other conveniences and facilities previously available to her, she might well have represented all firm clients to their complete satisfaction and also to the complete satisfaction of the firm. There is no more reason to assume that she would not

---

[8] Pennsylvania Rules of Court, p. 181 (1975).

fulfill her professional responsibilities than there is to believe that Thorp Reed itself would fail to adhere to the same professional guidelines. Moreover, if any actual conflict should arise, appropriate disciplinary sanctions could be invoked.

Thorp Reed has cogently argued further, however, that it must always be in a position to assign or reassign legal matters to those attorneys among its associates and members who are in its opinion best qualified to handle them, and we believe that it may be justified in believing that the Commission order would interfere with this right. Clearly the Code is intended to protect both clients and the general public from the effects of any possible conflict which might impair the judgment of an otherwise competent attorney, and normally a law firm would have the absolute discretion to consider any reasonably possible conflicts when making assignments of cases. We believe, therefore, that Thorp Reed should not be directed or required to assign or to reassign firm clients to Ms. Hanson in any case where a potential conflict affecting the interests of those clients is reasonably believed to exist. On the other hand, we do not believe that Thorp Reed should be permitted to discriminate in the assignment of cases of firm clients for any other than such sound professional reasons, for Ms. Hanson's interests in the pending discrimination charge are not per se adverse to the interests of Thorp Reed's clients. Nor can it be assumed that any interest she may have adverse to Thorp Reed as her employer would necessarily result in anything less than a complete exercise of independence of judgment toward Thorp Reed's clients, against whom she clearly has no grievance and bears no grudge.

Believing, therefore, that the Commission properly found an incidence of discrimination in employment which is prohibited under Section 5(d) of the

Act in this case but that its order requires modification, we issue the following

ORDER

AND Now, this 24th day of June, 1976, the decision and order of the Pennsylvania Human Relations Commission is hereby affirmed and modified as hereinabove indicated.

DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

As I understand the majority opinion, it accepts out of hand that the actions of Thorp Reed on March 6, 1975 and March 10, 1975, with respect to Ms. Hanson constitute an unlawful discriminatory practice against her under Section 5(d) of the Pennsylvania Human Relations Act—the so-called antiretaliatory provision—which makes it unlawful to discriminate in any manner against an employee because he or she has made a charge against the employer of actions proscribed by the statute. I take this to mean that the majority views action of any kind taken by an employer which in any manner alters the preexisting employer-employee relationship is a per se violation of Section 5(d) without regard to motive or intent, without regard to any other considerations which may or did enter into the employer action, and that its holding is applicable to all employer-employee relationships, including the practice of a profession, regardless of the legal strictures, codes of conduct or professional ethics under which the profession is practiced. I cannot agree with such an all inclusive interpretation of the statute.

The Pennsylvania Human Relations Act does not define the words "discrimination" or "discriminate." Rather Section 5 of the Act, the section with which we are here concerned, declares it to be an unlawful discriminatory practice, unless based upon bona fide

occupational qualifications, to engage in specified acts or to refuse to take enumerated actions (as set forth in sundry subsections) *based upon* or *because* of race, color, religion, creed, etc. In contrast to the other subsections of Section 5, subsection (d) simply declares it to be an unlawful discriminatory practice to discriminate in any manner, *i.e.*, it is an unlawful discrimination to discriminate.

With respect to the other *defined* discriminatory acts proscribed by Section 5, our Supreme Court and this Court have recognized that proof of the alleged discriminatory act may be supplied by statistical evidence and inferences reasonably drawn therefrom. However, the vice inherent in defining the unlawful conduct by the offense itself and the mischief that can be visited upon those whose presumed knowledge of the law cannot be more literate than the law itself, requires an adjudication under this subsection to be supported by proof greater than merely a change by the employer of the employer-employee relationship existing before the employer became aware of the filing of a complaint by the employee under another subsection of this section.

The words "discriminate" and "discrimination" are much used in today's society and equally much abused in their use. To discriminate is "to make a distinction in favor of or against a person or thing on a categorical basis rather than according to actual merit." *The Random House Dictionary* (College ed. 1969).

Surely the legislature did not intend and common sense does not dictate such a broad and all inclusive meaning to be ascribed to the word "discriminate" as used in subsection (d) without regard to the reason or reasons for the employer action. To impress any logical meaning upon the phrase "discriminate in any manner" as used in this subsection, the action

taken by the employer must be proven to have been taken *"because"* the employee has filed a complaint against the employer, *i.e.*, there must be substantial evidence going to the motive or intent of the employer action, which proof is not supplied simply by a change in the preexisting employer-employee relationship.

As I read the record of this case, there is a clear want of substantial evidence that the actions of respondent (appellant here) were motivated *because* complainant (intervening appellee here) had filed a charge against the employer under another subsection of Section 5. To the contrary, the record discloses a real and valid concern on the part of the partners of a law firm that its professional standards of conduct may have been compromised if not actually violated unless a change of the preexisting relationship was made. The underlying complaint of sex discrimination—theretofore kept secret—when revealed became a matter of concern not only to the law firm but to its clients as well. The charge of refusal to advance her to partnership status because of sex necessarily entails her qualifications to become a partner.[1] Given an issue of complainant's professional occupational qualifications and it becoming a matter of public knowledge, the record, in my view, discloses no more than the partnership acting as it did not because she brought the underlying charge but because it put in public focus her professional occupational qualifications, a subject which, in turn, required meaningful consideration and resolution of the application of the canons of ethics and standards of conduct in the situation then at hand. It matters not

---

[1] The want of bona fide occupational qualifications is an absolute defense to charges of discrimination with respect to employment under Section 5 of the Act.

whether the partnership viewed their application correctly or incorrectly. It does matter that the employer acted as it did because of its views upon the subject.

I would reverse the final order of the Commission.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. I hold the view that the commingling of prosecutorial and adjudicatory functions in the legal office of the Commission was a violation of due process. *Horn v. Township of Hilltown,* 461 Pa. 745, 337 A.2d 858 (1975).

The majority seems to suggest that the commingling here (1) only "perilously" approaches a violation of due process, *State Board of Medical Education and Licensure v. Grumbles,* 22 Pa. Commonwealth Ct. 74, 347 A.2d 782 (1975), and (2) was not a denial of due process since fairness requires essentially the absence of actual bias in the trial of the case. My understanding of *Grumbles* is that this Court, as dictum, stated that the commingling of functions, as here, if not a violation of due process, came perilously close to being so. As to the absence of actual bias resulting from the proceeding and its bearing on fairness, we must be mindful that the *Horn* decision was not based on the fact that prejudice resulted from the conflict of functions but on the necessity that governmental bodies charged with decision-making functions avoid the "appearance of possible prejudice." 461 Pa. at 748, 337 A.2d at 860.

I would therefore reverse the order of the Pennsylvania Human Relations Commission and remand this case for further proceedings, including an early hearing by the Commissioners relative to the original charge of discrimination.

Judge CRUMLISH, JR. joins in this dissent.