547 A.2d 818

Burns International Security Services, Incorporated, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent.

Denise L. Ross, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent.

Argued May 25, 1988, before President Judge CRUMLISH, JR., and Judges CRAIG, DOYLE, BARRY, PALLADINO, MCGINLEY and SMITH.

*Hayes C. Stover*, with him, *Matthew M. Hoffman* and *Charles E. Steele, Kirkpatrick & Lockhart,* for petitioner, Burns International Security Services, Incorporated.

*Gregory Gleason, Hough & Gleason, P.C.,* for petitioner, Denise L. Ross.

*Theresa Homisak,* Assistant Chief Counsel, for respondent.

OPINION BY JUDGE PALLADINO, September 14, 1988:

In this consolidated appeal, Burns International Security Services Incorporated (Burns) appeals an order of the Pennsylvania Human Relations Commission (Commission) determining that Burns had violated section 5(a) of the Pennsylvania Human Relations Act (PHRA)[1]

---

[1] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a).

by discriminating against Denise L. Ross (Ross) on the basis of disability/handicap and awarding backpay. Ross appeals that portion of the Commission's order denying her reinstatement and determining that she had not established that Burns had discriminated against her on the basis of gender. For the reasons set forth below, we vacate in part and affirm in part.

Ross was employed by Burns and worked as a watchman at the Beaver Valley Power Station in Shippingport, Pennsylvania. The Beaver Valley Power Station is a fully operable nuclear power station operated by Duquesne Light Company. The job duties of watchman include monitoring persons throughout the power station, conducting surveillance of the site, and guarding the doors of the facility. Watchmen are often required to work overtime, both voluntary and forced.[2]

In 1980, Ross began to suffer from endometriosis and intermittently experienced symptoms of severe pain, high fever, nausea, and cramping. Although Ross' physician prescribed medication to relieve her condition, Ross continued to experience the symptoms. On June 11, 1981, Ross' physician supplied her with a sick certificate which stated that she could only work eight (8) hours because of the nature of her illness. Complainant's Exhibit 2. Ross received a second sick certificate on July 23, 1981, which stated that she should "not be on her feet more than eight hours at a time unless she feels okay." Complainant's Exhibit 3. During the period between June 6, 1981 and July 23, 1981, Ross twice requested permission to be relieved from working over-

---

[2] "Voluntary" overtime is overtime scheduled in advance of an employee's reporting for an assigned shift. "Forced" overtime is generally not scheduled in advance. Senior employees have the opportunity to volunteer for the forced overtime. If none of the senior employees volunteers, the most junior employee with the least number of "forces" is required to work the overtime. Record at 586.

time because of the symptoms of endometriosis.[3] Ross worked approximately one hundred and six (106) hours of overtime from April 17, 1981 to July 23, 1981, her last day of work. Complainant's Exhibit 9.

On August 6, 1981, Burns sent a letter to Ross informing her that she would be placed on an involuntary medical leave of absence for a period of six (6) months and that her employment would be terminated at the expiration of the leave if she did not receive unrestricted permission to return to work.[4] On August 17, 1981, a Burns' representative telephoned Ross to inquire about her medical status. Upon learning that Ross was unwilling to disregard her physician's instructions, Burns' representative advised Ross that she was being placed on involuntary medical leave. Ross then filed her complaint with the Commission on August 31, 1981, alleging discrimination on the basis of gender and disability/handicap.

On September 10, 1981, Ross received medical confirmation that she was pregnant. Her pregnancy had the effect of putting the symptoms of endometriosis into remission. Ross delivered a child on April 27, 1982. On May 17, 1982, a Burns' representative telephoned Ross to notify her that her medical leave had expired and re-

---

[3] On June 6, 1981, while working the 3 P.M. to 11 P.M. shift, Ross asked to be relieved from overtime but remained on her post until 3 A.M. On June 7, 1981, Ross reported off sick. On July 22, 1981, Ross requested to be relieved from her post. Her morning supervisor initially agreed to her request, however, her afternoon supervisor advised her to remain at her post until her shift was completed. This supervisor also informed Ross that she was required to obtain an unrestricted work release from her physician.

[4] Ross was examined by Burns' company physician on July 30, 1981 and was informed that she was physically able to work overtime. Stipulation of Fact No. 6.

quested that she return to work.[5] Ross responded that "[i]t would have to be up to the Human Relations Commission." Notes of Testimony at 70-71. During this same conversation, Ross did not inform the Burns' representative that she had been pregnant nor that she had given birth to a child. By letter dated May 19, 1982, Burns notified Ross that her employment was terminated. On June 30, 1982, Ross informed Burns that she had unrestricted permission to return to work.

Hearings were then held before a hearing panel. The hearing panel determined that Ross had met her initial burden of establishing a prima facie case of discrimination based upon handicap/disability. The panel further concluded that Burns did not establish that Ross' disability was job-related. After reviewing the findings and conclusions of the panel, by order dated May 1, 1987, the Commission adopted the recommendation of the panel and ordered Burns to cease and desist from engaging in discrimination on the basis of handicap/disability. The Commission also awarded to Ross backpay plus interest for the period of July 22, 1981 to December 1, 1981. However, the Commission declined to order the reinstatement of Ross. The hearing panel also determined that Ross had not proven gender-based discrimination.

On appeal to this court, Burns contends that the Commission erred as a matter of law because PHRA is preempted by federal law. Burns also argues that the backpay award is not supported by substantial evidence and was calculated erroneously.[6] Ross argues that the

---

[5] While Ross was on involuntary medical leave, Burns altered its policy on medical leave which had the effect of extending Ross' leave for another three (3) months. Respondent's Exhibit 16.

[6] Burns asserts that, at most, Ross is entitled to backpay until September 10, 1981, the date on which she learned that she was pregnant.

Commission erred in concluding that she had not met her burden of establishing gender-based discrimination. Ross also contends that the Commission erred in failing to order her reinstatement, alleging that her placement on involuntary medical leave and subsequent termination were part of one illegal transaction.

Our scope of review of a Commission order is limited to a determination of whether constitutional rights were violated, an error of law was committed, or whether findings of fact are supported by substantial evidence. *Williamsburg Community School District v. Pennsylvania Human Relations Commission,* 99 Pa. Commonwealth Ct. 206, 512 A.2d 1339 (1986).

A prima facie case of discrimination under PHRA is established by proving that the complainant is a member of a protected class, has suffered adverse employment action, and that others not in the class have been treated differently. *Williamsburg.* Once a prima facie case has been established, a rebuttable presumption arises that the employer has unlawfully discriminated against the complainant. *Id.* If the employer offers a non-discriminatory explanation for the employment action, the presumption drops from the case and the entire body of evidence produced by each side is evaluated by the trier of fact according to the preponderance of evidence standard. *Allegheny Housing Rehabilitation Corporation v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 532 A.2d 315 (1987).

However, before this court can address the Commission's conclusion that Ross established a prima facie case of handicap-based discrimination under PHRA, we must first review the principles of law relevant to the doctrine of federal preemption in order to determine whether state law governs this case.

FEDERAL PREEMPTION

"If Congress evidences an intent to occupy a given field, any state law falling within that particular field is preempted." *Silkwood v. Kerr-McGee Corporation*, 464 U.S. 238, 248 (1984). The intent to occupy a given field may be explicitly stated in the federal statute's language or may be implied from the statute's structure and purpose. *Jones v. Roth Packing Company*, 430. U.S. 519 (1977).

> When there is no explicit preemptive language, an intent to pre-empt can be inferred where (1) the federal scheme of regulation is so pervasive as to create a reasonable inference that Congress left no room for the states to supplement the law in the area or (2) the federal law pertains to an area in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state law on the same subject' or (3) the goal to be obtained by the federal law and 'the character of obligations imposed by it may reveal the same purpose.'

*Carolina Freight Carriers v. Pennsylvania Human Relations Commission*, 99 Pa. Commonwealth Ct. 428, 433, 513 A.2d 579, 582 (1986) (citing and quoting *Fidelity Federal Savings and Loan Association v. De La Cuesta*, 458 U.S. 141, 153 (1982)). Even when federal law has not completely displaced state law, state law is nullified if it either conflicts with federal law, an event which occurs when compliance with both state and federal law is impossible, or is an obstacle to the accomplishment and execution of the goals of the federal law. *Fidelity Federal.*

With the above principles in mind, we now turn to the particular laws involved in this case. Section 5(a) of PHRA provides that it shall be an unlawful discriminatory practice for an employer to discriminate against an

individual with respect to terms and conditions of employment on the basis of a non-job related handicap or disability, unless based upon a bona fide occupational qualification, if that individual is the best able and most competent to perform the services required. 43 P.S. §955(a). Section 4(p) of PHRA defines "non-job related handicap" as "any handicap or disability which does not substantially interfere with the ability to perform essential functions of employment. . . ." 43 P.S. §954(p).[7]

---

[7] Pursuant to PHRA, the Commission has promulgated regulations which further define the terms in the PHRA. These regulations provide in pertinent part:

Handicapped or disabled person—Includes the following:
(i) A person who:
(A) has a physical or mental impairment which substantially limits one or more major life activities; .

. . .

(C) is regarded as having such an impairment.
(ii) As used in subparagraph (i) of this paragraph, the phrase:

. . .

(D) 'is regarded as having an impairment' means has a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer . . . as constituting such a limitation . . . or has none of the impairments defined in subparagraph (i)(A) of this paragraph but is treated by any employer as having such an impairment.
Non-job-related handicap or disability—Includes the following:

. . .

(ii) A handicap or disability is not job-related merely because the job may pose a threat of harm to the employee or applicant with the handicap or disability unless such threat is one of demonstrable and serious harm.
(iii) A handicap or disability may be job-related if placing the handicapped or disabled employee or applicant in the job would pose a demonstrable threat of harm to the health and safety of others.
16 Pa. Code §44.4.

Burns contends that these provisions of PHRA and regulations enacted thereunder are preempted by the Atomic Energy Act of 1954, 42 U.S.C. §§2011-2296.[8] The United States Supreme Court has addressed the issue of the extent to which the Atomic Energy Act and applicable regulations preempt state law in *Pacific Gas and Electric Company v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190 (1983). In *Pacific Gas,* the Supreme Court held that Congress, in passing the Atomic Energy Act, intended that the federal government should regulate the radiological safety aspects involved in the construction and operation of a nuclear power plant but that states retain traditional responsibility over the regulation of electrical utilities based upon questions of need, reliability, cost, and other related state concerns. 461 U.S. at 205.

We note that section 2021(c) of the Atomic Energy Act vests the Nuclear Regulatory Commission (NRC) with the authority and responsibility to regulate the construction and operation of any production or utilization facility. 42 U.S.C. §2021(c). However, section 2021(k) states that nothing in this section shall be construed to affect the authority of any state or local agency to regulate activities for purposes other than protection against radiation hazards. 42 U.S.C. §2021(k).[9]

---

[8] The hearing panel of the Commission in this case determined that it need not consider the federal preemption issue, reasoning that Ross' endometriosis did not constitute a physical condition which substantially limited a major life activity, but was instead a condition which Burns merely *regarded* as a handicap or disability.

[9] Section 2018 of the Atomic Energy Act also provides that the Act shall not be construed to affect the authority or regulations of any federal, state, or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the NRC. 42 U.S.C. §2018.

Pursuant to the Atomic Energy Act, the NRC has also promulgated extensive regulations concerning the operation of a nuclear power plant as well as the qualifications necessary for persons employed at such a facility. *See* 10 C.F.R. §73.55, Appendix B. The NRC's general criteria for security personnel provide that:

> Individuals whose security tasks and job duties are directly associated with the effective implementation of the licensee physical security and contingency plans shall have no physical weaknesses or abnormalities that would adversely affect the performance of assigned security job duties.

10 C.F.R. §73.55, Appendix B(I)(B)(1)(a). These regulations prohibit a licensee from permitting an individual to act as a guard watchman, armed response person, or other member of the security organization unless that individual has been trained, equipped, and qualified to perform each assigned security job duty. *See* 10 C.F.R. §73.55(b)(4). The NRC regulations further require an individual who has been incapacitated because of a serious illness, injury, disease, or operation, which could interfere with the effective performance of assigned security job duties, to provide medical evidence of recovery and ability to perform those assigned duties, prior to the resumption of those security duties. 10 C.F.R. §73.55, Appendix B(I)(B)(1)(b)(5). The requirements of Appendix B are also made applicable to contract security personnel employed at the licensee facility. 10 C.F.R. §73.55, Appendix B(II)(C).

Relying upon the standards set forth in the above federal statute and regulations, Burns contends that Ross' condition adversely affected her job in two respects: that she was not available on an unrestricted basis to work an eight hour day and/or overtime and that the symptoms of endometriosis which she experienced

could interfere with her ability to perform self-defense skills as required by NRC regulations. Thus, Burns argues that its termination of Ross did not constitute unlawful discrimination, alleging that retention of an employee unable to perform assigned security tasks when necessary could impair the licensee facility's safe operation and subject the facility to possible sanctions by the NRC.

Although we discern no explicit preemptive language in the federal statute and regulations with respect to state employment discrimination legislation, we conclude that PHRA has been impliedly preempted to the extent that federal law establishes particular standards for the physical and mental qualifications for security personnel at a nuclear power plant.[10] Given the pervasive nature of the NRC's regulations governing the safety of operations at a nuclear power plant, including the minimum physical and mental qualifications required of security personnel employed at such a facility, it is clear that the proper standard for ascertaining Ross' fitness for duty is derived from federal law. *See Pacific Gas.* Whether Ross' endometriosis is a physical weakness or abnormality which "would have" or merely "could have" affected the performance of her assigned security tasks is an entirely separate question, which this court will not undertake to determine.[11]

---

[10] Burns has *not* asserted a federal preemption argument with respect to Ross' claim of gender-based discrimination. Thus, our holding is confined to the handicap/disability-based discrimination issue.

[11] *See also Davidson v. United States Department of Energy,* 838 F.2d 850 (6th Cir. 1988) (court of appeals granted Department of Energy's motion for summary judgment and dismissed complaint brought by former and present security inspectors of privately operated nuclear power plant challenging disparate impact of Department of Energy's regulations on minimum physical qualifications).

Because we reach this conclusion, we do not address those portions of the Commission's order pertaining to the award of backpay and refusal to order the reinstatement of Ross.

## GENDER-BASED DISCRIMINATION

In her appeal, Ross contends that the Commission erred in determining that she had not established gender-based discrimination under section 5(a) of the PHRA.[12] In support of her claim, Ross presented the testimony of Mr. Charles Wandel, a Burns employee also working at the nuclear power plant. Mr. Wandel testified that, during the fall of 1980, he was temporarily disabled from a kidney stone operation and that when he returned to work, he presented his supervisor with a sick certificate in which his physician restricted him from working overtime for a period of three weeks. Notes of Testimony at 14. Mr. Wandel further testified that he was not forced to work overtime during this period. Notes of Testimony at 12-16, 18-19.

Citing *Freeport Area School District v. Pennsylvania Human Relations Commission,* 18 Pa. Commonwealth Ct. 400, 335 A.2d 873 (1975), *rev'd on other grounds,* 467 Pa. 522, 359 A.2d 724 (1976), the Commission determined that one incident of disparate treatment of a male employee in comparison to that accorded a female employee, without more, was insufficient evidence to establish gender-based discrimination. The Commission also noted that, in contrast to Ross, Mr. Wandel never attempted to use his sick certificate in

---

[12] Section 5(a) also provides that it shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, for an employer to discriminate on the basis of gender against an individual with respect to terms and conditions of employment if that individual is the best able and most competent to perform the services required. 43 P.S. §955(a).

order to be relieved from working overtime. Having carefully reviewed the record on this issue, we will not disturb the Commission's conclusions, recognizing that questions of evidentiary weight and witness credibility are within the province of the Commission. *Beaver Cemetery v. Pennsylvania Human Relations Commission,* 107 Pa. Commonwealth Ct. 190, 528 A.2d 282 (1987).

Accordingly, because we conclude that federal law is preemptive of state law, we vacate the Commission's order relating to discrimination based upon handicap/disability. We affirm the Commission's order determining that Ross did not meet her burden of proving gender-based discrimination.

### ORDER

AND NOW, September 14, 1988, the order of the Pennsylvania Human Relations Commission in the above-captioned matter is vacated as to discrimination based upon handicap/disability and affirmed as to discrimination based upon gender.

Judge SMITH dissents.