INFINITY BROADCASTING
CORPORATION,
Petitioner

v.

PENNSYLVANIA HUMAN
RELATIONS COMMISSION,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 2005.

Decided Feb. 9, 2006.

Reargument Denied March 29, 2006.

Judith E. Harris, Philadelphia, for petitioner.

Pamela Darville, Asst. Chief Counsel, Philadelphia, for respondent.

Jeffrey Campolongo, Philadelphia, for intervenor, Shawn Brooks.

BEFORE: McGINLEY, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge COHN JUBELIRER.

Infinity Broadcasting Corporation (Employer) petitions for review of a final order of the Pennsylvania Human Relations Commission (PHRC) that found that it had unlawfully discriminated against its employee, Shawn Brooks, based on his race—African American—in violation of Section 5(a) of the Pennsylvania Human Relations Act (PHRA)[1] when it created a hostile work environment which resulted in Brooks' constructive discharge.

The following facts have been taken from the Hearing Panel's adjudication.[2] Brooks began working for Employer in September 2000 as the only African American account executive, selling advertising on radio station WYSP in connection with its broadcasts of the Philadelphia Eagles football games. His yearly salary was $30,000 with $2,500 a month "draw."[3]

Brooks and six other account executives reported to Joseph Zurzolo, Sales Manager, who reported to Peter Kleiner, General Sales Manager, who in turn reported to Kenneth Stevens, Vice President/General Manager. Employer had an anti-discrimination/harassment policy in place providing that harassment based on race would not be tolerated and that a complainant could file a complaint with any designated representative for Employer. (Findings of Fact (FOF) ¶¶ 40–44.)[4]

On May 9, 2001, Zurzolo conducted a sales meeting where he distributed a book entitled, "New Dress for Success," (the book) to his account executives in an effort to address the unprofessional manner in which a Caucasian female account executive had been dressing. (FOF ¶¶ 13–14, 91.) He had not read the book prior to distributing it, but the book had been recommended to him by Jeffrey Snodgrass, WYSP's Sports Sales Manager. Zurzolo distributed the book to *all* account executives in an effort not to single the female account executive out. *Id.* Brooks took the book home that day but, after reading it, contacted Sandy Shields, Human Resource Director, and complained about the content of the book. Specifically, Brooks was offended by specific passages in the book[5]

---

1. Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(a). Section 5(a) of the PHRA states, in pertinent part: "[i]t shall be unlawful discriminatory practice ... (a) [f]or any employer because of the race [or] color ... of any individual ... to refuse to hire or employ or contract with, or to bar or to discharge from employment...."

2. On February 28, 2005, the PHRC adopted the Hearing Panel's findings, conclusions and recommendation in full.

3. A "draw" represents dollars that are earned in regards to selling Eagles products or advertising sales. (FOF ¶ 7.)

4. Employer's anti-discrimination/harassment policy states that it "will not tolerate any form

of harassment on account of race, color...." (FOF ¶ 41.) The policy further defines harassment as:

> Harassing conduct includes, but is not limited to: epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; degrading jokes and display or circulation in the workplace of written or graphic material that designates or shows hostility or aversion toward an individual or group; including through e-mail.

(FOF ¶ 42.)

5. The Complaint avers that "[t]he book contained numerous racially offensive comments/statements, including but not limited to:

that referred to "most blacks being anti-establishment," "afros," "ghettos," "ghetto black," and advised Black salesmen to "dress very white." (*See* FOF ¶ 18.) Brooks testified that he did not contact Zurzolo or anyone else in the office because he did not trust them and felt that the views of the book were tolerated and accepted. (FOF ¶¶ 19, 20, 25–26.)

Shields spoke to Brooks on several occasions about the book, and she testified that she agreed with Brooks that the contents were offensive. (FOF ¶¶ 45, 49.) Shields, however, did not contact Employer's corporate office about Brooks' concerns, but she did collect the books from all of the account executives the same day the books were distributed. (FOF ¶¶ 49–50.) Brooks testified that none of the supervisors did anything regarding the book and that Zurzolo was not formally disciplined for distributing it. (FOF ¶¶ 53, 96.) However, Zurzolo and Kleiner made several telephone calls to Brooks asking him to return their calls, but he never returned their calls because he did not trust or respect them. (FOF ¶¶ 54–55.) Moreover, Zurzolo testified that he did not read the book prior to it being distributed, and that, in retrospect, he wished he had never distributed the book because he could see how someone would be offended by it. (FOF ¶¶ 93, 95.)

> (i) "When selling to middle-class Blacks, you can not dress like a ghetto Black."
> (ii) "You should avoid a solid dark blue [suit], it has a very negative association for Blacks."
> (iii) "When selling to them [African–Americans], you can wear nothing that carries an establishment touch .... you must not wear the traditional suit, shirt and tie uniform."
> (iv) "Women are much better at selling to blacks because they are considered to be outside the establishment."

There is no evidence in the record to suggest that, prior to Brooks' complaint to Shields about the content of the book, he had ever before reported any alleged discriminatory conduct.

Brooks filed his complaint with the PHRC on May 16, 2001.[6] The complaint alleged *only* that Employer's distribution of the book created a hostile work environment, which caused his constructive discharge. Brooks did not make any other allegations. The PHRC made a subsequent investigation into Brooks' allegations and notified both parties that probable cause existed to credit the allegation that the·distribution of the book, alone, violated the PHRA. Thus, the case was approved for a public hearing.

On November 6, 2003, a public hearing was held before a Hearing Panel of three Commissioners. Not only did Brooks testify as to the offensive content of the book, but he also testified that Zurzolo racially harassed him *prior to the distribution of the book* on several occasions when: 1) Zurzolo made a comment to Brooks about "having to go with [Brooks'] fiancée," which Brooks perceived to mean that Zurzolo wanted to have sex with her; 2) Zurzolo, on several occasions, would put his palm on the head of an older African American receptionist, Edith Mason, which he felt was a racially offensive gesture;[7]

> (v) "Almost all members of Northern ghettos who are in lower socioeconomic groups are understandably antiestablishment."
> (Compl.¶ 3(f)(i)-(v).)

6. After Brooks filed his Complaint, he returned to the office only to hand in his letter of resignation on May 28, 2001, when the radio station was closed.

7. Ms. Mason, however, testified that this was a friendly gesture, which she did not find racially offensive. (11/7/03 Test. at 96–97.) In fact, Ms. Mason testified that she and Zurzolo were friends and worked together in the

3) Zurzolo used the ethnic slur "dago" in reference to himself; 4) Zurzolo touched an African American receptionist on a sales call at Comcast; and 5) someone stole a promotional banner relating to his ING Direct account, which he felt was racially motivated. (FOF ¶¶ 21–23, 28–30; Hearing Panel Op. at 30; PHRC Br. at 23.) There is no evidence of record to suggest that Brooks orally, or in writing, requested to amend his Complaint to include these additional allegations of harassment.

The Hearing Panel issued findings of fact, conclusions of law, an opinion, a proposed order and a recommendation finding Brooks had proven racial discrimination in violation of Section 5(a) of the PHRA. Specifically, the Hearing Panel found that Brooks established a prima facie case of harassment based on race because: 1) Brooks was subjected to offensive conduct based on the distribution of the book *and* the other allegations of harassment; 2) the distribution of the book was severe and the other allegations of harassment were pervasive; 3) Brooks was detrimentally affected by the harassment, negating his ability to work, which was reasonable under the circumstances; and, 4) Brooks' direct supervisor was the individual who distributed the book and also engaged in the other allegations of harassment. (Op. at 29–32.) The Hearing Panel also determined that Brooks was constructively discharged based on the racially offensive conduct at his workplace. (Op. at 33.) The Hearing

Panel noted that Brooks' complaint was never taken seriously by Shields or anyone else at the office and that Zurzolo was never formally disciplined in any manner. *Id.* at 34. Finding that Brooks had shown unlawful discrimination under the PHRA, the Hearing Panel recommended that he be awarded back pay and front pay. *Id.* at 35–38.

On February 28, 2005, the PHRC adopted, in full, the Hearing Panel's findings and recommendation that Brooks was subjected to a hostile work environment and was constructively discharged. The PHRC awarded Brooks $282,262.00 in back pay and five years of front pay, in the amount of $328,000.00, based on four of the highest paid account executives.[8] In addition, the PHRC ordered Employer to 1) draft and implement internal policies and procedures, subject to the PHRC's review, for handling employee complaints of discriminatory treatment; and, 2) provide workplace training on harassment and anti-discrimination laws.

On March 30, 2005, Employer petitioned this Court for review. A few days later, the PHRC stayed its Final Order in exchange for Employer's agreement to post a bond in the amount of the monetary damages awarded to Brooks.

On appeal,[9] Employer raises seven issues for our review. We are asked to determine whether the PHRC: 1) denied Employer due process because one of the members on the Hearing Panel, Commis-

past, that he had informed her about her now current job with Employer and, on several occasions, he would periodically provide her transportation to and from work when the weather was bad. *Id.* at 94–96.

8. There were approximately 25 account executives within the Company. (FOF ¶ 4.)

9. This court's review is limited to whether the PHRC's determination is in accordance with

law, whether the necessary factual findings are supported by substantial evidence, and whether there has been a violation of constitutional rights. *Borough of Econ. v. Pa. Human Relations Comm'n*, 660 A.2d 143, 146 (Pa.Cmwlth.1995), *pet. for allowance of appeal denied*, 543 Pa. 696, 670 A.2d 143 (1995). "Our appellate review must focus on whether there is rational support in the record, when viewed as a whole, to support the PHRC's action." *Id.*

sioner Raquel Otero de Yiengst, was not impartial; 2) erroneously admitted into evidence and relied upon acts of alleged harassment other than the distribution of the book; 3) erred in determining that Employer subjected Brooks to a hostile work environment; 4) erred in determining that Brooks was constructively discharged; 5) erred in determining that Brooks is entitled to recover $282,262.00 in back pay; 6) erred in awarding Brooks more than $300,000.00 in front pay; and, 7) erred in ordering injunctive relief.

Employer first argues that it was denied due process because Commissioner Otero de Yiengst was not impartial. Specifically, Employer argues that the Commissioner had prior knowledge of the book and harbored negative personal feelings toward it when she stated at the end of her questioning that "I'm Hispanic and . . . it is my belief that anybody that would read that book would be greatly offended by that. . . ." (11/6/03 Tr. at 325.) Thus, Employer argues that it was denied due process because the Commissioner publicly expressed her predisposition of bias in favor of Brooks.

■ It is clear that being afforded a fair trial before a fair tribunal is a basic requirement of due process, and that this requirement applies to administrative agencies. *Dayoub v. Com., State Dental Council and Examining Bd.*, 70 Pa. Cmwlth. 621, 453 A.2d 751, 753 (1982). "It is equally clear that due process is denied where there is a commingling of the prosecutorial and adjudicatory functions before an administrative body, and that administrative tribunals must be unbiased and must avoid even the appearance of bias to be in accordance with principles of due process." *Id.* (citation omitted). We are mindful that our focus is on the fact finding process, which "must be afforded the broadest dimensions of constitutional protections." *Id.* (citing Com., *Human Relations Comm'n v. Thorp, Reed, Armstrong*, 25 Pa.Cmwlth. 295, 361 A.2d 497 (1976)).

■ However, contrary to Employer's assertion of a violation of due process, we agree with the PHRC that the remarks made by Commissioner Otero de Yiengst were nothing more than her observations of a book that is offensive. The record demonstrates that this statement was made **after** all the evidence was submitted and, thus, supports the finding that the Hearing Panel properly weighed all the evidence presented in its adjudication, *Togans v. Com., State Civil Serv. Comm'n,* 69 Pa.Cmwlth. 431, 452 A.2d 576, 579 (1982), prior to forming an opinion. Therefore, this particular remark by the Commissioner is insufficient to reverse the PHRC's decision. Moreover, the PHRC independently evaluated all the evidence presented and was not compelled to accept the recommendation made by the Hearing Panel. Therefore, we find no violation of Employer's constitutional right to due process.

Next, Employer asserts that the PHRC erred in admitting evidence and relying on acts of alleged harassment other than the distribution of the book, which included: a) Zurzolo's use of ethnic slurs to describe himself as a "dago"; b) comments by Zurzolo which Brooks perceived as expressing a desire to have sex with Brooks' fiancé; and, c) Zurzolo's habit of "palming" the head of his African American receptionist. (Hearing Panel Op. at 28, 30–33.)

Section 9(a) of the PHRA permits any person claiming to be aggrieved by an unlawful discriminatory practice to file with the PHRC a written verified complaint setting forth *"the particulars"* against the employer alleged to have committed the discrimination. 43 P.S. § 959(a). The General Assembly provided this procedure to put the alleged discriminator on notice of the *specific* conduct

which is alleged to be discriminatory. *Murphy v. Pa. Human Relations Comm'n,* 77 Pa.Cmwlth. 291, 465 A.2d 740, 746 (1983), *affirmed,* 506 Pa. 549, 486 A.2d 388 (1985), *appeal dismissed,* 471 U.S. 1132, 105 S.Ct. 2669, 86 L.Ed.2d 689 (1985). After the filing of the complaint, the PHRC conducts a prompt investigation in connection with the complaint. 43 P.S. § 959(b)(1). Following the investigation, if probable cause is found to credit the allegations of the complaint, and if attempts to conciliate the dispute fail, the PHRC "may approve the convening of a public hearing on the merits of the *complaint.*" 16 Pa. Code § 42.101 (emphasis added). *"Only after the alleged discriminator is informed of the specific conduct complained of,* has been informed that the Commission has found probable cause to credit the allegations of the complaint, and has refused, after conciliation efforts, to modify its behavior, does the matter proceed through the sometimes lengthy and expensive process of a formal hearing...." *Murphy,* 465 A.2d at 746 (emphasis added). It is at this public hearing where the alleged discriminator is required to *"answer the charges of such complaint."* 43 P.S. § 959(d) (emphasis added).

Employer contends that admitting into evidence and relying on Brooks' testimony of the other allegations of harassment was error because: 1) it was denied an opportunity to respond to these allegations during the investigative stage of the PHRC's proceedings; 2) the PHRC relied entirely on the distribution of the book in finding probable cause; and, 3) Brooks did not raise any allegation of harassment, other than the book, in the complaint. Therefore, the additional allegations of harassment were beyond the scope of the hearing.

The PHRC argues that Brooks' testimony, regarding the other alleged acts of harassment, was admitted into evidence as exceptions to the hearsay rule as to Brooks' "state of mind" with respect to the racial hostility, intimidation and condescension, and to explain why Brooks did not trust Employer's Caucasian management staff. Therefore, the PHRC's reliance on this evidence was proper. We disagree.

■ Both the PHRA and case law make clear that the PHRC should not have relied on evidence other than the distribution of the book in finding a hostile work environment and constructive discharge. The complaint did not list the other allegations of harassment, and at no time did Brooks amend the complaint to reflect the same. 43 P.S. § 959(e) (stating that "the complainant shall have the power reasonably and fairly to amend any complaint...."") The purpose of filing a complaint under Section 9 of the PHRA is not simply to inform an alleged discriminator that it will be made the subject of an investigation; it is also to inform the employer of the specific conduct complained of, so that it will know, after probable cause is found, and conciliation efforts are initiated, what voluntary changes it can make to avoid litigation. *Murphy,* 465 A.2d at 746. Here, the complaint failed to perform this function. Consequently, Employer failed to receive notice of the additional allegations and, consequently, was denied the opportunity to defend against them. Accordingly, we hold that the PHRC erred in admitting evidence and relying on allegations of harassment other than what was alleged in the complaint—the distribution of the book.

■ Next, Employer argues that the PHRC erred in finding that it subjected Brooks to a hostile work environment.[10]

10. "The PHRA is generally applied in accor-     dance with Title VII [of the Civil Rights Act of

In order to prima facie establish a hostile work environment under the PHRA, a complainant must demonstrate that he: 1) suffered intentional discrimination because of his race or gender; 2) the harassment was severe or pervasive and regular; 3) the harassment detrimentally affected him; 4) the harassment would detrimentally affect a reasonable person of the same protected class; and 5) the harasser was a supervisory employee or agent. *Barra v. Rose Tree Media Sch. Dist.*, 858 A.2d 206, 215 (Pa.Cmwlth.2004). The main issue that we are confronted with in this case is whether the distribution of the book, *alone*, is enough to demonstrate a hostile work environment based on racial discrimination.

■ In determining whether a working environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The conduct must constitute an objective change in the terms and conditions of employment. *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275. Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not actionable under the PHRA. *Id.* at 788, 118 S.Ct. 2275.

We find that Brooks has failed to present sufficient evidence with respect to the second element, whether the harassment was severe or pervasive and regular.

■ To be actionable under the PHRA, the harassing behavior complained of must be "sufficiently severe or pervasive to alter the conditions of [the complainant's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations and internal quotation marks omitted) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). Harassment is pervasive and regular when "incidents of harassment occur either in concert or with regularity." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3rd Cir.1990) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2nd Cir.1987)). Despite this high standard, however, the Third Circuit has acknowledged that "the advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3rd Cir.2001).

The Third Circuit found sufficient evidence to support a hostile work environment claim in *Cardenas* and *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir.1996), wherein the complainants introduced several instances of severe and pervasive harassment. In *Cardenas*, the defendants subjected a Mexican–American employee to ethnic slurs, including referring to him as "the boy from the barrio" and "mojado" (the Spanish word for "wetback"), wrote derogatory messages on the

1964, 42 U.S.C. § 2000e et seq.]. Thus, Pennsylvania courts may look to Title VII precedents when interpreting the Pennsylvania statute." *Bailey v. Storlazzi*, 729 A.2d 1206,

1211 n. 6 (Pa.Super.1999) (citations omitted); *see also Chmill v. City of Pittsburgh*, 488 Pa. 470, 491, 412 A.2d 860, 871 (1980) ("harmonizing" the PHRA and Title VII together).

marker board in plaintiff's cubicle, rounded the numbers on all other employee evaluations upward while rounding the plaintiff's numbers downward, disproportionately assigned other minorities and trainees to the employee's unit, knowingly gave employee contradictory instructions and impossible-to-perform tasks, and referred to employee as "an affirmative-action hire." *Cardenas,* 269 F.3d at 258–59. Similarly, in *Aman,* the Third Circuit found a hostile work environment where African–American employees were referred to as "one of them" or "another one," told not to touch or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to do their jobs withheld, and were given conflicting orders. Additionally, the employer's general manager had commented at a district meeting that "the blacks were against the whites" and that if they did not like it they could leave. *Aman,* 85 F.3d at 1078–79.

▇ Although *Cardenas* and *Aman* are just two examples of a hostile work environment based on severe and pervasive harassment, courts have consistently required a stronger showing of egregious conduct than that described by Brooks. *See, e.g., Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843–44 (8th Cir.2002) (holding that "racist graffiti— drawings of 'KKK,' a swastika, and a hooded figure" on the walls of the plant bathroom, a racially derogatory "poem" strewn about the plant, and three racially derogatory comments made about plaintiff (but out of his presence) were "neither severe nor pervasive . . ."); *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535 (7th Cir.2002) (finding that six incidents, including a reference to black music as "wicca wicca woo music" by a supervisor, a bar-

tender's request to investigate an African–American guest who was allegedly stealing coins from a fountain, other African–American guests being denied additional ice and cups for a party, and one use of the word "n———" in complainant's presence, were not severe or pervasive); *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (holding that two overtly racial remarks directed at complainant, including use of the terms "KKK" and "n———," distribution of a racial cartoon, and general ridicule and harassment were not severe or pervasive).

▇ When weighed against the above, the one time distribution of the book is insufficient to satisfy the *severity* requirement of a hostile work environment claim. While there is no question that the distribution of the book at issue here was unprofessional, insulting and insensitive, it was not severe and pervasive as in *Cardenas* and *Aman.* Here, there was one isolated incident of alleged harassment and, while it is possible for a single action to constitute a claim for hostile work environment harassment if the act is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work," generally a complainant must show that he was subjected to "repeated, if not persistent acts of harassment." *Bedford v. Southeastern Pa. Transp. Auth.,* 867 F.Supp. 288, 297 (E.D.Pa.1994). In other words, the isolated incident must be "extremely serious." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275.

There is no reported Pennsylvania state or 3rd Circuit/federal district court decision within Pennsylvania in which a court has found that a single incident of racial harassment was sufficiently severe or pervasive to create a hostile work environment. However, the United States Supreme Court has addressed a similar issue when it recently found insufficient, as a

matter of law, a woman's complaint that her supervisor and a co-worker were talking and laughing in her presence about a comment that "making love to you is like making love to the Grand Canyon." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 269, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Although the complainant was not the subject of the offensive statement, she was present while her supervisor and co-worker discussed it. *Id.* The High Court held, "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard. [It was] at worst an 'isolated inciden[t]' that cannot remotely be considered 'extremely serious,' as our cases require." *Id.* at 271, 121 S.Ct. 1508 (citing *Faragher*).

The PHRC relies on *Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir.1991) and *Tomka v. The Seiler Corp.,* 66 F.3d 1295 (2nd Cir.1995), which are two out-of-state cases, for the proposition that a single, isolated incident could be considered pervasive or severe. However, the PHRC's reliance on these cases is misplaced. First, *Daniels* and *Tomka* did not involve a *single incident* of harassing behavior. Second, and more importantly, the facts in *Daniels* and *Tomka* are in direct contrast to the facts in this case because they dealt with intentional, inexcusable, and repulsive behavior such as hanging a black dummy by a noose; racist graffiti written in the restroom; calling an African American a "dumb n———"; and a complainant being raped repeatedly by her supervisors.

In the case *sub judice,* Employer shamefully made the mistake of ignorance when it distributed the book in an innocent manner. While Zurzolo failed to exercise responsibility and good judgment by not reading the book before it was distributed, which would have avoided Brooks' complaint, we cannot conclude that this isolat-ed incident on the part of Employer rises to the severe level of that in *Daniels* and *Tomka.* It is not reasonable to believe that the single incident recounted above violated the PHRA's standard. In addition, the PHRC's record and findings demonstrate that the distribution of the book was not racially motivated. Zurzolo distributed the book because of a Caucasian female Account Executive who was dressing inappropriately; the book was distributed to all Account Executives, so as not to single the female out; and Zurzolo did not read the book prior to distribution and was, thus, unaware of its contents. Following Brooks' oral complaint about the contents of the book, Employer promptly responded by collecting all copies of the book, verbally reprimanding Zurzolo for distributing it without reading it first, and disavowing the views expressed in the book. Additionally, Zurzolo never distributed any other materials after his reprimand. Furthermore, there is no evidence that Zurzolo or anyone else employed by Employer made a racial comment directed to Brooks. Therefore, because of the lack of substantial evidence to support the PHRC's conclusion of a hostile work environment based on race, we must reverse the order of the PHRC.

Because we find that Brooks failed to show by substantial evidence that he was subjected to severe and pervasive harassment, we need not reach the other elements of a hostile work environment claim. Likewise, in finding Brooks was not subjected to a hostile work environment, the PHRC's finding of constructive discharge is reversed and, thus, damages are not appropriate.

### ORDER

NOW, February 9, 2006, the order of the Pennsylvania Human Relations Com-

mission in the above-captioned matter is hereby reversed.