J-A09035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GREG MORVICK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARMSTRONG COUNTY MEMORIAL | : | No. 995 WDA 2020 |
| HOSPITAL | : | |

Appeal from the Order Entered September 9, 2020
In the Court of Common Pleas of Armstrong County Civil Division at
No(s):  G.D. No. 2017-0647

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED:  July 6, 2021**

Greg Morvick (Morvick) appeals from the September 9, 2020 order granting summary judgment in the Court of Common Pleas of Armstrong County (trial court) on his claims of gender-based hostile work environment and constructive discharge against Armstrong County Memorial Hospital (ACMH).  We affirm.

**I.**

We glean the following facts from the certified record.  Morvick began working for ACMH in the housekeeping department in 1979.  In 1982, he moved to a position in the materials management department where he spent the rest of his career at ACMH.  The department consists of office workers and

_____

[*] Retired Senior Judge assigned to the Superior Court.

warehouse workers who report to the same supervisor and interact with each other on a regular basis. Morvick worked in the office beginning in 2001. At the time of his resignation, the office consisted of Morvick, Diane Vogeley (Vogeley) and Stephanie Dunmire (Dunmire).[1]

In 2002, Morvick and Vogeley both applied for the manager position in the materials management department and Vogeley was awarded the position. Morvick was given a purchasing assistant position. He reported to Vogeley for the next 14 years and she was solely responsible for evaluating his performance. Because they worked together in the office section of the department, they interacted with each other daily. Morvick was responsible for maintaining inventory in the storeroom, handling returns and dealing with maintenance agreements and rental equipment.

Vogeley provided Morvick with annual written performance reviews. The performance reviews consistently praised him for safety, reliability, knowledge of the storeroom, punctuality and rarely missing work. In 2005 and 2007 through 2013, Vogeley wrote that Morvick should improve his time management, organization and communication skills. Morvick consistently disagreed with these assessments and said that he always completed his work

_____

[1] Dunmire is occasionally referred to in the record by her former name, "Stephanie Czekanski." For consistency, we refer to her as Dunmire throughout this memorandum.

and had maintained the same high level of performance throughout his years in the department.

In 2014, Vogeley's assessment of Morvick was more critical. She again identified time management as an area for improvement and wrote that Morvick "[s]eems busy, but work is not completed on time." Depo. of Morvick, 7/31/18, at 81. She stated that he needed to work on prioritizing the needs of customers, communicating and keeping her informed of problems or difficulty completing tasks. She noted that he did not like being corrected or informed of his mistakes. She said he needed to organize his workspace and ensure that certain tasks were completed in a timely manner. However, she did again note that he was always on time for work and rarely called off. Morvick had signed all the previous evaluations but he refused to sign the 2014 form because he disagreed with the criticisms of his performance.

Vogeley again addressed these issues in a counseling session with Morvick on November 5, 2014. She also asked Morvick to show her and Dunmire how his desk was organized so that they could find documents and information in his absence. Morvick disagreed with her concerns, saying that he had maintained the same level of productivity as always and should not have to explain his desk or organization to the other office workers. Morvick emailed Vogeley this response and said that she did not respond in writing but did become angry and yell at him in the office.

On December 3, 2014, Vogeley issued Morvick a verbal warning for several unresolved performance issues. Morvick disagreed with the verbal warning and believed that it was issued because he was a man. He stated that he always followed protocol in handling work issues. He said that he was the only man in the office and no other employee had ever gotten a similar warning. He considered the verbal warning to be an example of how Vogeley "downgraded [him] on a continuous basis." *Id.* at 92.

The next day, Morvick sent an email to Anne Remaley (Remaley), the director of human resources (HR), asking to meet with her. Morvick did not explain the reason for the meeting in his email but later testified that he wanted to speak to her because he felt he was being bullied by Vogeley. Remaley did not respond to the email. Morvick believed she did not respond because she was working with Vogeley in issuing the various warnings regarding his performance.

Vogeley sent a follow-up email on December 18, 2014, identifying some issues from the counseling session that had not been addressed. Again, Morvick disagreed with her assessment and believed that he had already addressed the issues that had been raised in the counseling session. He did not respond to the email.

On February 13, 2015, Vogeley issued a written warning to Morvick reprimanding him for failing to process an invoice in a timely manner and failing to communicate a problem with the invoice to her. The warning related

to a specific invoice that had been issued approximately five months prior and which had not been paid. Morvick refused to sign the written warning, stating that he had followed department procedures in handling the invoice. He said that the invoice was incorrect and he had been working with the vendor and accounts payable to remedy the issue. Morvick considered the written warning to be a form of harassment, as he believed that no other employee had ever been issued such a warning.

On June 4, 2015, Vogeley placed Morvick on a Performance Improvement Plan (PIP) addressing the issues she had previously identified. Remaley was present at the meeting and dismissed Morvick's complaints about Vogeley's behavior. When he told her that Vogeley yelled at him regularly, she responded that she also yells at people and "there's nothing to it." *Id.* at 109. Morvick testified that after he was placed on the PIP, Vogeley increased his workload so that he had to work nights and weekends to complete his tasks. He also said that her yelling and slamming doors during the workday distracted him from his work.

On July 17, 2015, Morvick sent ACMH a resignation letter through counsel and filed a charge of discrimination against ACMH with the Equal Employment Opportunity Commission (EEOC) and Pennsylvania Human Relations Commission (PHRC). The letter informed ACMH that he was resigning effective August 31, 2015:

> [o]n advice of counsel, I will not meet to discuss my decision nor
> will I discuss with you the [c]harge of discrimination I filed with

the EEOC/PHRC and copied to you all. I will no longer attend meetings with any one of you to have you berate and humiliate me. I will continue to do my job to the high standard I have followed during all of my long career at [ACMH].

*Id.* at 105, Defendant's Exhibit 20. While Morvick admitted that he was never explicitly threatened with termination by Vogeley or anyone else at ACMH, he said that it was clear based on the PIP and the other warnings that he would be terminated. He testified that he felt humiliated when Vogeley scheduled a meeting with him and Remaley without telling him beforehand or explaining what would be discussed.

ACMH responded to Morvick's resignation letter by informing him that it would continue to pay him through August 31, 2015, but that he should no longer come to work. Morvick filed a second charge of discrimination with the EEOC and PHRC in November 2015 alleging wrongful termination, retaliation, age discrimination and hostile work environment. After exhausting administrative remedies, he initiated this action in the trial court on May 4, 2017, raising claims of hostile work environment based on gender discrimination, wrongful termination/constructive discharge, and retaliation.[2]

At the time of his resignation, the materials management department had seven employees who reported to Vogeley. Three of the employees were

_____

[2] Morvick later withdrew his claim of retaliation. In addition, he initially filed claims for hostile work environment, wrongful termination and retaliation based on age discrimination, but he withdrew these claims in 2018. *See* Plaintiff's Praecipe to Withdraw/Partial Less than All of the Claims, 7/23/18.

male and four were female. The other two male employees continued to work at ACMH under Vogeley. Raina Matson (Matson), a female employee from the storeroom, took over Morvick's position as purchasing assistant. Another woman was hired in May 2016 to fill a newly-created position as an expeditor and took over one of the duties previously handled by the purchasing assistants.

Morvick believed that Vogeley fabricated the performance issues addressed in his evaluation and the subsequent warnings. In addition, he stated that she screamed at him for trivial reasons on a daily basis, making it difficult for him to concentrate on his work. She increased his workload such that he had to return to the office at night to complete his tasks. He said that she would snap at him if he attempted to ask her questions, slam the door when he left her office and single him out for criticism. In contrast, Morvick did not witness Vogeley acting in this manner with the women who worked in the department. Morvick observed Dunmire spend time chatting, using her cell phone and surfing the internet but he never saw Vogeley reprimand her for these behaviors. He heard Vogeley praise Dunmire's work and assumed that she received positive evaluations.

Morvick maintained a document on his work computer describing incidents with Vogeley. As early as 2005, he wrote that Vogeley was "scrutinizing every move" he made or would throw a "temper tantrum" regarding how he handled a work issue. *Id.* at 121-22. He stated that he did

not document everything but he did list incidents in 2005, 2007, 2011, 2012 and 2014. In 2012, he wrote that Vogeley constantly criticized him and in 2014, he wrote that he was "being singled out more and more." ***Id.*** at 123-24. He wrote that he was the only employee who was constantly treated poorly by Vogeley but that Dunmire was also affected by Vogeley's behavior.

Morvick also described an incident in which Vogeley treated Matson differently than she would have treated him. Matson interrupted a closed-door meeting he was having with Vogeley with a complaint and Vogeley responded by politely listening to Matson's concerns. In contrast, Vogeley yelled at Morvick for interrupting her when he approached her with a work question while she was making small talk with a female employee. In addition, Morvick said that storeroom employees had complained to Vogeley that Matson would disappear for long periods of time and spend a lot of time talking to people instead of working. In one instance, Matson failed to receive an incoming order, resulting in inventory problems. Morvick did not believe Matson was ever disciplined for these issues.

After placing him on the PIP, Vogeley removed the shelving units from Morvick's office, making it more difficult for him to organize his materials and manage returns. She then yelled at him for being disorganized. Vogeley berated Morvick regarding back orders and for failing to complete a back order report on a day when the office was short-staffed. Shortly before placing Morvick on the PIP, Vogeley started requiring him to fill out a detailed daily

time sheet. Vogeley did not require any other employees to complete a time sheet but told Morvick that he would have to do so "forever." *Id.* at 135. Morvick said that as a result of Vogeley's treatment, he began to suffer anxiety, difficulty sleeping, high blood pressure and emotional distress.

Morvick recalled two of Vogeley's statements he believed evidenced a bias against men. First, Vogeley commented that she could not get things for her department that the maintenance manager could because she "[didn't] have a penis." *Id.* at 183. Second, following her divorce, Vogeley was upset and stated that she did not want a man in her life.

In response to Morvick's allegations, Vogeley testified that she addressed all performance issues within the department in the same manner regardless of the employee's gender. She provided examples of counseling sessions, negative performance reviews and verbal warnings she had issued to female members of the department in recent years.[3] She said that she never placed these employees on a PIP because they responded to feedback by improving their performances. She asked Morvick to improve his time management, organization and productivity for several years but his performance consistently declined, making the PIP necessary.

_____

[3] One such verbal warning was issued to Dunmire in 2012 for using her cell phone during working hours. Dunmire also received a counseling session in 2014 regarding organization of her desk and communication skills.

The parties also deposed Linda Clark (Clark), a former employee who had retired but maintained a personal friendship with Morvick.[4] Clark testified that Vogeley would yell at and intimidate all of her employees, but she believed that Morvick was treated more harshly and yelled at more frequently than the others. The department had daily "huddle" meetings with all employees and Clark testified that Vogeley repeatedly berated Morvick at these meetings. Clark and other employees discussed how Vogeley treated him poorly. She said Vogeley would yell at Morvick for supply issues that were out of his control. Clark also witnessed Vogeley criticize a former male storeroom worker who Clark believed to be one of the hardest-working employees. Clark said she believed Vogeley's criticisms of Morvick's performance were exaggerated because the department hired two employees to replace him.

Vogeley had counseled Clark on areas for improvement shortly before her retirement in 2015. Vogeley told Clark that she should not leave her assigned work incomplete when she left for the day and she should notify Vogeley if she could not complete her work. She also instructed Clark not to come to work early or stay late without first obtaining approval for overtime.

_____

[4] Clark worked in the storeroom section of the department. She explained that Vogeley was her supervisor, but the storeroom employees were members of a union while the office employees were not. She believed that Vogeley would yell at and intimidate Morvick more often than any of the storeroom employees who were protected by the union.

Clark said that she agreed with Vogeley's criticisms of her work and said that she became slower in her last year of employment.

Clark also witnessed the two statements that Morvick identified as evidencing a bias against men. Clark did not hear Vogeley ever say that she did not like to work with Morvick or any other male employees because they were men. She did believe that Vogeley forced Morvick to resign by making it uncomfortable for Morvick to work in the department.

The parties also deposed Gordon Crissman (Crissman), a male storeroom clerk, regarding his experience working under Vogeley. Crissman testified that he saw Vogeley yelling at Morvick and at all the other employees in the department. He stated that she would speak "strongly" about how she wanted things to be done. Depo. of Crissman, 6/20/19, at 29. He also said that Vogeley would speak "forcefully" to Morvick and others in the department. *Id.* at 35. He did not witness Vogeley using inappropriate language toward Morvick or slamming doors. Crissman believed that Vogeley's assessment of his own performance was fair and that she did not treat him differently than she treated female employees.

After the close of fact discovery, Morvick filed a motion for status conference in the trial court and listed recusal of all Armstrong County judges as an issue to be addressed. Plaintiff's Consented to Motion to Schedule Status Conference, 1/7/20, at 2-3. The status conference was held on March 6, 2020. The trial court subsequently issued a scheduling order setting forth

deadlines for dispositive motions and a date for oral argument. ACMH filed its motion for summary judgment and supporting brief on May 28, 2020, and Morvick filed his response on July 17, 2020.

On September 9, 2020, the trial court issued a memorandum and order granting ACMH's motion for summary judgment. Morvick timely appealed and he and the trial court have complied with Pa.R.A.P. 1925.

**II.**

Morvick's first two issues on appeal relate to recusal of the trial court. He contends that the trial court abused its discretion by denying a motion to recuse and by failing to recuse itself *sua sponte* because the judge and his immediate family had a volunteer relationship with ACMH. He further argues that the trial court was biased because Morvick's counsel represented a former court employee in an age discrimination suit filed against the trial court. These issues are waived.

Morvick mentioned recusal twice in his motion requesting a status conference:

> 7. Plaintiff will be moving for recusal of all Armstrong County Judges, including Judge McClister, Judge Panchik and Judge Valasek, due to conflict of interest.
>
> ***
>
> 11. The purpose for a Status Conference is to establish dates for the filing of Defendant's Motion for Summary Judgment and Plaintiff's Opposition thereto, as well as the filing of a Motion for the Recusal of Judges McClister, Panchik and Valasek, if required by the Court.

- 12 -

Plaintiff's Consented to Motion to Schedule Status Conference, 1/7/20, at 2-3.[5] The status conference was subsequently held on March 6, 2020, in chambers without a court reporter. The trial court issued a scheduling order thereafter that did not reference recusal. Order, 3/9/20. Morvick did not file a written motion for recusal.

Morvick did not raise the issue of recusal again until he filed his concise statement pursuant to Pa.R.A.P. 1925(b) after the trial court had granted ACMH's motion for summary judgment and he had filed a timely notice of appeal. The trial court concluded that the issue was waived because Morvick failed to file a written motion for recusal, did not ensure that the status conference was placed on the record and did not raise the issue at any point after the conference. Trial Court Opinion, 10/19/20, at 2-3. Regarding whether recusal was discussed at the status conference, the trial court stated that it "[did] not recall the subjects of discussion other than as they are reflected in its subsequent order." *Id.* at 3. In the alternative, the trial court concluded that the issue was meritless. *Id.* at 3-4.

Whether to grant a motion for recusal is a decision within the sound discretion of the trial court:

> In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the

---

[5] Morvick attached as an exhibit to the motion a 2014 pamphlet from ACMH listing Judge McClister as a board member.

outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion.

*Arnold v. Arnold*, 847 A.2d 674, 680-81 (Pa. Super. 2004) (citation & quotation omitted). By addressing a recusal motion to the trial court in the first instance, the moving party allows the judge to "to state his or her reasons for granting or denying the motion and, as the allegedly biased party, to develop a record on the matter." *Commonwealth v. Lucky*, 229 A.3d 657, 670 (Pa. Super. 2020) (quoting *Commonwealth v. Whitmore*, 912 A.2d 827, 834 (Pa. 2006)).

It is well-settled that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa. R.A.P. 302(a). In reviewing a case on appeal, we may only consider facts or documents contained in the certified record. *Commonwealth v. Rush*, 959 A.2d 945, 949 (Pa. Super. 2008). "This Court does not rely on items *dehors* the record, such as assertions in an appellate brief or a trial court opinion." *Id.* The certified record on appeal consists of "original papers and exhibits filed in the lower court, paper copies of legal papers filed with the prothonotary by means of electronic filing, *the transcript of proceedings, if any*, and a certified copy of the docket entries prepared by the clerk of the lower court." Pa.R.A.P. 1921 (emphasis added).

Other than Morvick's limited assertions in his motion for status conference, ***supra***, the record does not contain any reference to a motion for recusal that was addressed to and decided by the trial court. To the contrary, the motion for status conference indicates only that Morvick would file a recusal motion in the future "if required by the Court." Plaintiff's Consented to Motion to Schedule Status Conference, 1/7/20, at 2-3. No such motion was ever filed. Morvick contends in his brief on appeal that the trial court denied recusal during the status conference. However, he did not ensure that a court reporter was present to place the conference on the record and we may not consider assertions or statements of fact in an appellate brief that are not reflected in the certified record. ***Rush***, ***supra***. Finally, because there is no transcript of the status conference, the trial court did not recall the particulars of the discussion. Trial Court Opinion, 10/19/20, at 2-3. As a result, we have no record upon which to conduct our review of the trial court's exercise of discretion. This issue is waived.

## III.

Next, Morvick argues that the trial court erred in granting ACMH's motion for summary judgment.[6] "[S]ummary judgment is appropriate only in

---

[6] This Court's scope of review of a trial court's order granting summary judgment is plenary and we apply the same standard for summary judgment as does the trial court. "[A]n appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." ***Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899, 902–03 (Pa. 2007) (internal

those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." ***Atcovitz v. Gulph Mills Tennis Club, Inc.***, 812 A.2d 1218, 1221 (Pa. 2002); Pa. R.C.P. No. 1035.2. When considering a motion for summary judgment, the trial court must construe all facts of record and make all reasonable inferences in the light that most favors the non-moving party. ***See Toy v. Metropolitan Life Ins. Co.***, 928 A.2d 186, 195 (Pa. 2007). Any question as to whether there exists a genuine issue of material fact must be resolved against the moving party. ***Id.***

The Pennsylvania Human Relations Act (PHRA) prohibits employers from engaging in gender-based discrimination. 43 P.S. § 955(a). "Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts. Therefore, though not binding on our state courts, federal court interpretations of Title VII of the Civil Rights Act of 1964. . . serve to inform this Court's interpretations of the PHRA." ***Kroptavich v. Pa. Power & Light Co.***, 795 A.2d 1048, 1055 (Pa. Super. 2002) (citations omitted).

### A.

To establish hostile work environment claim, a plaintiff must prove:

(1) he suffered intentional discrimination because of his [protected status], (2) the harassment was severe or pervasive,

---

citations omitted). A *de novo* standard of review applies as to whether there exists an issue of material fact, as this presents a pure question of law. ***Id.***

(3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in that position, and (5) the existence of *respondeat superior* liability.

**Renna v. PPL Elec. Utilities, Inc.**, 207 A.3d 355, 368 (Pa. Super. 2019).

"Thus, simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not actionable under the PHRA." **Infinity Broadcasting Corp. v. PHRC**, 893 A.2d 151, 158 (Pa. Cmwlth. 2006) (internal quotations omitted). Rather, the offensive conduct must be so severe or pervasive as to "constitute an objective change in the terms and conditions of employment." **Id.** These standards ensure that hostile work environment claims are not used to enforce a "general civility code" in the workplace and "[p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." **Faragher v. City of Boca Raton**, 524 U.S. 775, 788 (1998) (cleaned up).

Here, ACMH contends that Morvick failed to adduce evidence to establish the first, second and fourth elements of his hostile work environment claim. The trial court concluded that Morvick failed to establish the first element and declined to address the remaining elements. Trial Court Opinion, 9/9/20 at 7-9 & n.2. After our review of the record in the light most favorable to Morvick, we agree.

To survive summary judgment on the first prong of a hostile work environment claim, Morvick must adduce *prima facie* evidence that the

allegedly discriminatory conduct was motivated by his gender. ***Renna***, ***supra***. "The critical issue. . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." ***Oncale v. Sundowner Offshore Servs., Inc.***, 523 U.S. 75, 80 (1998) (quotations omitted). A plaintiff is not required to provide direct evidence that the employer's actions were intended to be discriminatory; rather, this Court examines "the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment in evaluating a hostile work environment claim." ***Infinity Broadcasting Corp.***, ***supra*** (internal quotations omitted).

Morvick contends that Vogeley subjected him to a hostile work environment because of his gender for several reasons. He argues that Vogeley screamed at him every day but did not treat his female coworkers similarly. Clark testified that Vogeley singled Morvick out in the daily huddle meetings for being slow and yelled at another male storeroom clerk for being slow as well. Morvick also recalled an incident where Vogeley yelled at him for interrupting her but said that she did not yell at Matson for the same behavior.

Morvick also contends that after he was placed on the PIP, Vogeley increased his workload so that he would have to return to the office at night to complete his tasks. He believed that Dunmire did not have a similarly high

workload because he observed her using her cell phone and the internet and chatting with coworkers during the workday. He believed that the other employees in the department were not subjected to disciplinary measures for performance issues. Finally, he identified two remarks made by Vogeley that he believed evidenced her bias against men. First, after a staff meeting, Vogeley said that she was not able to get the same things as the other managers because she did not have a penis. Second, shortly after Vogeley's divorce, she said that she did not need a man in her life.

Viewed in the light most favorable to Morvick, these circumstances establish that Vogeley was an aggressive and disagreeable manager who was dissatisfied with Morvick's performance. However, the record does not establish *prima facie* evidence that Vogeley's treatment of Morvick was intentional discrimination based on his gender. Vogeley yelled at all her employees, male and female, and had counseling sessions and issued warnings for performance issues for male and female employees. The record shows that any difference in her treatment of Morvick was based on long-term performance issues that he declined to address rather than bias against him based on gender.

Clark and Crissman both agreed with Morvick's testimony that Vogeley would yell at him frequently in front of other employees. Clark testified that Vogeley would criticize Morvick for being slow, use an inappropriate tone with him and yell at him for back order issues. However, Clark also testified that

Vogeley would yell at and attempt to intimidate all her employees, male and female. Crissman saw Vogeley raise her voice at Morvick but also stated that she yelled at all employees in the department. He testified that the yelling was always related to work or performance issues. He did not hear Vogeley use any inappropriate language toward Morvick or slam doors, though he did believe that she spoke "forcefully" to her employees. Depo. of Crissman, 6/20/19, at 35. While Vogeley clearly engaged in inappropriate yelling when speaking with her employees, the record does not support the conclusion that she treated Morvick poorly specifically because of his gender.

Morvick also contends that he was subjected to progressive discipline for fabricated performance issues and that none of his female coworkers received similar warnings or a PIP. However, the record reveals that the performance issues identified in Morvick's 2014 evaluation were not cut from the whole cloth. Vogeley had identified time management and communication and organization as areas for improvement in Morvick's evaluations in 2005 and 2007 through 2013. In those same evaluations, Vogeley gave him positive feedback in areas such as punctuality and knowledge of the storeroom. The record only establishes that the escalating series of disciplinary measures was the culmination of several years of feedback regarding performance issues and was not the result of a gender-based bias.

While Morvick alleged that Dunmire and Matson received favorable evaluations and were not disciplined for their performance issues, this opinion

was based purely on speculation regarding their interactions with Vogeley. In fact, Vogeley produced evidence that she had counseling sessions with Dunmire in 2014 and 2015 regarding cross-training with Morvick, keeping her desk organized and communicating more effectively. She also issued Dunmire a verbal warning in 2012 regarding her cell phone use. While Morvick contended that Dunmire was not disciplined for using her phone during work hours, and that he was the only employee who was required to explain his desk organization to others, the evidence did not support his assumptions. Vogeley also wrote in one of Matson's performance evaluations that she needed to work on improving communication, just as she had advised Morvick in his evaluations.

In addition, Clark testified that she had been counseled by Vogeley regarding performance issues in the year before her retirement. In a counseling session which she documented with a follow-up email, Vogeley told Clark that she could not leave work incomplete at the end of the day and that she should notify Vogeley if she was falling behind. She also instructed Clark not to come to work early or stay late without first obtaining approval for overtime. Importantly, Clark agreed that Vogeley's criticisms of her work were fair and admitted that she was not performing well in her final year before retirement. When asked at his deposition whether Vogeley's reviews of his performance were fair, Crissman also testified that he believed Vogeley was fair and that he was not treated any differently than his female coworkers.

Morvick's conclusory allegations that Vogeley did not discipline female employees for performance issues and treated him differently because he is a man are not supported by the record.

Finally, the two gendered statements that Morvick identified do not alter our conclusion. While the statements were inappropriate for a workplace, they were not directed at Morvick specifically and Vogeley did not express any opinion or belief regarding whether men were capable employees. In addition, Morvick worked under Vogeley for approximately 14 years prior to his resignation but the record does not reveal when the two statements occurred.

Simply put, the record does not support the inference that Vogeley's treatment of Morvick was motivated by a bias against him based on his gender. Courts have repeatedly emphasized that hostile work environment claims are not intended to create a "general civility code" for the workplace, nor do they create redress for "the ordinary tribulations of the workplace." *Faragher*, *supra*. Rather, the allegedly discriminatory behavior must be based on the complainant's protected status. Here, the evidence does not support the conclusion that Vogeley mistreated Morvick because he was a man, but only that she was dissatisfied with his performance in her department for several years prior to the PIP and his resignation. The trial court did not err in granting summary judgment on his hostile work environment claim.

**B.**

Because Vogeley's actions were not gender-based, Morvick's constructive discharge claim necessarily fails because he can't establish that any allegedly intolerable conditions were based on gender discrimination. "Constructive discharge occurs only when an employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Raya & Haig Hair Salon v. PHRC*, 915 A.2d 728, 733 (Pa. Cmwlth. 2007) (cleaned up). Intolerability cannot be established based on the employee's subjective judgment or even on the basis that resignation was the best decision under the circumstances. For this reason, the United States Supreme Court has referred to constructive discharge as an "aggravated case" of hostile work environment. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146 (2004). Even if he had made out a case that Vogeley's actions were caused by his gender, Morvick failed to adduce evidence of intolerability that would compel a reasonable person to feel that there was no other choice but to resign.

In *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159 (3d Cir. 1993), the court identified several factors commonly cited to establish intolerability, emphasizing that no single factor is required or dispositive: threats of discharge by the employer, demotion, reduction in pay or benefits, involuntary transfer to a less desirable position, alteration of job responsibilities, and unsatisfactory job evaluations. *Id.* at 1161; *see also Duffy v. Paper Magic*

***Grp., Inc.***, 265 F.3d 163, 168 (3d Cir. 2001) ("[I]t is important to note that we have never made the ***Clowes*** factors an absolute requirement for recovery.").

In ***Clowes***, the court held that the plaintiff was not constructively discharged when she did not suffer from any of the identified factors, but was merely subjected to "allegedly overzealous supervision of her work," including criticism in front of other staff and being spoken to in a "demeaning, condescending manner." ***Clowes***, ***supra***, at 1160-62 (internal quotations omitted). These actions were not so degrading or oppressive as to render the working conditions intolerable. Additionally, the plaintiff did not request to transfer to another position, file a grievance against her supervisor or advise her employer that she would leave if her work environment did not change. ***Id.*** at 1161. The court noted that while these steps are not required to state a constructive discharge claim, "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." ***Id.***

Similarly, in ***Duffy***, the court rejected a constructive discharge claim when the plaintiff alleged that her department was understaffed; she was excluded from committees, hiring decisions and a staff meeting and seminar; and she was the only supervisor who was given a weekly "report card" concerning her performance. ***Duffy***, ***supra***, at 169. None of these circumstances made it impossible for the plaintiff to do her job, and she was

never assigned menial or degrading work or subjected to a reduction in pay. *Id.* The court held that occasional remarks about the plaintiff's age and being passed over for a promotion were not so derogatory that a reasonable person would conclude that there was no alternative to resignation. *Id.* at 170. Even though the plaintiff alleged that the circumstances that caused her stress and resulted in health problems, "a stressful environment does not amount to constructive discharge." *Id.*

Morvick has adduced evidence of "overzealous supervision" and a stressful work environment as described in *Clowes* and *Duffy*. Just as in those cases, the circumstances here did not rise to the high level of intolerability required to establish a constructive discharge claim. It is undisputed that Morvick was never demoted or involuntarily transferred to a less desirable position, nor did he suffer a reduction in pay or benefits. *Clowes*, *supra*, at 1161. No one at ACMH ever threatened Morvick with termination; he merely assumed that he would be terminated based on the progressive discipline that resulted in the PIP. Morvick received an unsatisfactory job evaluation in 2014, followed over a period of months by a counseling session, a verbal warning, a written warning and a PIP. He has also established evidence of an alteration of job responsibilities through the higher workload and the removal of shelving from his office. However, these changes do not constitute such intolerable conditions that a reasonable person

would feel compelled to resign. More than a "stressful environment" is required to establish intolerability. ***Duffy***, ***supra***.

Morvick's allegations center almost entirely on Vogeley's treatment of him, yet he took scant steps to address this issue to HR. Morvick sent a single email to Remaley in December 2014 asking to meet with her. He did not explain the purpose of the meeting and he did not follow up to ensure that the meeting occurred when Remaley did not respond. He first raised the issue of Vogeley's yelling to Remaley in February 2015 when he was placed on the PIP. He did not make any further attempts to report Vogeley's behavior or to transfer to a different position. ***Clowes***, ***supra***; ***compare Raya & Haig Hair Salon***, ***supra***, at 731, 734 (holding that plaintiff was compelled to resign when she complained six times to her employer about manager's ongoing physical and verbal sexual harassment and employer did not remedy the situation). We agree with the trial court's conclusion that Morvick has not shown the level of intolerability that would compel a reasonable person to resign.

Accordingly, for the foregoing reasons, we affirm the trial court's grant of summary judgment on the constructive discharge claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/2021